REVISED DECEMBER 13, 2007

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2007

Charles R. Fulbruge III
Clerk

No. 06-11071

NAVIGANT CONSULTING INC

Plaintiff - Appellee

v.

JOHN WILKINSON; SHARON TAULMAN

Defendants - Appellants

Appeal from the United States District Court
for the Northern District of Texas

Before KING, GARZA, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

Navigant Consulting, Inc., brought this diversity action against former employees John Wilkinson and Sharon Taulman, alleging, inter alia, breach of fiduciary duty, breach of contract, and misappropriation of trade secrets. The case was tried to a jury, which returned a verdict in favor of Navigant on all three claims. The district court entered judgment against Wilkinson and Taulman, who now appeal. We AFFIRM, in part, and VACATE and REMAND, in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

John Wilkinson and Sharon Taulman were employees of Navigant Consulting, Inc. ("Navigant"), a national consulting company. Wilkinson and Taulman managed the operations of Navigant's claims administration practice in Dallas (the "Claims Practice"), which specialized in the administration of complex class-action settlements. They were responsible for staffing, budgeting, business development, client relations, and negotiating contracts on Navigant's behalf. Though they were at-will employees, Wilkinson and Taulman were bound by noncompete, nonsolicitation, and confidentiality agreements.

In April 2001, one of Navigant's competitors, First Union, called Wilkinson and expressed an interest in acquiring the Claims Practice from Navigant. In response, Wilkinson and Taulman prepared and transmitted a proposal to First Union. This proposal promised the delivery of "all, or virtually all, the existing clients; plus accompanying employees," of the Claims Practice to First Union, and set a purchase price of $22.5 million. The transaction was to be accomplished by "seek[ing] novation of [Navigant's] existing engagements into a management-owned corporation, and then simultaneously sell[ing] the capital stock to the buyer." The "management-owned corporation" was an entity, unrelated to Navigant, owned by Wilkinson and Taulman.

As part of the proposal to First Union, Wilkinson and Taulman included a variety of business information about the Claims Practice, such as revenue projections, backlog estimates (work sold but not yet performed), margin rates, descriptions of current engagements and potential engagements that Navigant was bidding on, specific information about the responsibilities and roles of a number of named senior-level employees, and more general information about the turnover, staffing rate, and profit margins on the remaining employees. Wilkinson and Taulman did not inform Navigant that First Union had expressed an interest in buying the Claims Practice, or that they had proposed to sell the Claims Practice in exchange for a payment to their own corporation.

Nothing came of the offer to First Union, but Wilkinson and Taulman continued to try to sell the Claims Practice to other competitors of Navigant, including PriceWaterhouseCoopers ("PWC"), in July 2001, LECG, LLC ("LECG"), in May 2002, and Rust Consulting ("Rust"), in June 2002.[1] In connection with these proposals Wilkinson and Taulman disclosed information about the Claims Practice similar to that contained in the proposal to First Union. They also met with representatives of competitors in Navigant's Dallas office, introduced Navigant employees to these representatives, and, in one case, traveled to Minneapolis to meet with a competitor and brought along a Navigant employee for an interview.

In May 2001, Wilkinson signed a four-year lease on Navigant's behalf for office space in Thanksgiving Tower in downtown Dallas. Wilkinson and Taulman had previously recommended the lease to Navigant's corporate office, and Wilkinson was authorized to sign it.

In June 2002, a computer technician in Navigant's Dallas office was directed to copy company data onto a portable, non-Navigant server. He was told that it was a "special project" for Wilkinson and that he should not inform Navigant's corporate office in Chicago. Worried that he was being involved in some kind of illicit activity, the technician contacted a supervisor outside of the Dallas office. His report aroused suspicions in Navigant's corporate office and prompted Navigant's general counsel and another executive to make a surprise visit to the Dallas office on August 23, 2002, where Wilkinson was instructed to discontinue the practice of transferring data to non-Navigant servers. Navigant also hired an outside law firm to look into the matter.

A few days later, Wilkinson contacted LECG, which he and Taulman had previously provided with a proposal containing detailed information about the

---

[1] Another of Navigant's competitors, Charles River, also received a proposal, but it is unclear from the record when this proposal was made.

Claims Practice, and indicated that he wanted to "move quickly" on a deal. On September 5, 2002, Wilkinson faxed a new proposal to LECG that identified Wilkinson, Taulman, and two other individuals as the "Sellers/Employees" of the Claims Practice. Like the previous proposal, this transaction was to be routed through a corporation owned by Wilkinson and Taulman, which was to receive options on 250,000 shares of LECG stock and $1.2 million in cash. Wilkinson also sought to become the agent of LECG for the purpose of negotiating with Navigant for a "smooth and orderly transition."

On September 24, 2002, Wilkinson met with two Navigant corporate officers in Chicago. He did not inform them that he was simultaneously negotiating with LECG and had sought authority to act as LECG's agent to negotiate with Navigant. Rather, he proposed to "take the business off [Navigant's] hands" in exchange for assuming Navigant's obligation on the Thanksgiving Tower lease. Navigant rejected the offer. Two days later, on September 26, Wilkinson and Taulman submitted their resignations, effective September 30, and shortly thereafter accepted offers to join LECG.

On October 8, 2002, Navigant filed suit against Wilkinson and another Navigant employee who was subsequently dismissed.[2] Taulman was added as a defendant in Navigant's amended complaint, which pleaded a variety of causes of action relating to Wilkinson and Taulman's conduct while employed with Navigant. The case proceeded to trial on breach of fiduciary duty, breach of contract, and misappropriation of trade secrets claims against Wilkinson and Taulman on August 1, 2005.[3]

---

[2] This employee had been involved in the furtive copying of data onto the non-Navigant server in June 2002.

[3] Wilkinson and Taulman also counterclaimed against Navigant for breach of contract, but this claim is not before us on appeal.

At the close of all evidence, Wilkinson and Taulman moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, which was denied by the district court. The jury then found Wilkinson and Taulman liable on each cause of action, awarded damages of $1,917,880 against Wilkinson and $1,837,453 against Taulman, and awarded exemplary damages of $200,000 against Wilkinson and $200,000 against Taulman. In addition, the district court awarded attorney's fees of $574,149.60 against Taulman. Wilkinson and Taulman moved for judgment as a matter of law under Rule 50(b), and, in the alternative, for a new trial or to alter or amend the judgment under Rule 59. The district court determined that the recovery for misappropriation of trade secrets had been duplicated in Navigant's recovery for breach of fiduciary duty and reduced the recovery against Wilkinson and Taulman accordingly, but otherwise denied the Rule 50(b) and Rule 59 motions. Wilkinson and Taulman now appeal.

## II. SUFFICIENCY OF THE EVIDENCE

Wilkinson and Taulman first argue that the evidence presented at trial was insufficient to support the jury's verdict against them for breach of fiduciary duty, breach of contract, and misappropriation of trade secrets, as well as the jury's award of exemplary damages. The district court denied Wilkinson and Taulman's Rule 50(b) motion as to the challenges to the sufficiency of the evidence of breach of fiduciary duty, breach of contract, and the award of exemplary damages. In light of its elimination of the damage awards for misappropriation of trade secrets, the district court declined to consider the motion on that issue.

A.    Standard of Review

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229, 235 (5th Cir. 2001)

(internal quotations and citations omitted) (omission in original). "We review de novo the district court's ruling on a motion for judgment as a matter of law, applying the same standard as the trial court." Id. "We consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." Brown v. Bryan County, 219 F.3d 450, 456 (5th Cir. 2000). Although our review is de novo, "we note that our standard of review with respect to a jury verdict is especially deferential." Id. (citing Snyder v. Trepagnier, 142 F.3d 791, 795 (5th Cir. 1998)). "As such, judgment as a matter of law should not be granted unless the facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" Flowers, 247 F.3d at 235 (quoting Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1322 (5th Cir. 1994)). A jury verdict must be upheld unless "a reasonable jury would not have a legally sufficient evidentiary basis to find" as the jury did. FED. R. CIV. P. 50(a)(1); see Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 296–97 (5th Cir. 2005).

B.    Breach of Fiduciary Duty

Wilkinson and Taulman argue that the evidence was insufficient to hold them liable for breach of fiduciary duty. "The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Wilkinson and Taulman do not dispute the existence of a fiduciary relationship with Navigant. They contend that the evidence at trial was insufficient to prove that: (1) they breached their duty; or (2) Navigant suffered damages proximately caused by their breach.

Texas law recognizes two types of fiduciary relationships. The first, a formal fiduciary relationship, "arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The second, an informal fiduciary relationship, "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." Jones, 196 S.W.3d at 449. An informal fiduciary relationship may arise between an employee and employer. See e.g., Molex, Inc. v. Nolen, 759 F.2d 474, 479 (5th Cir. 1985) (applying Texas law and holding that a sales representative had a fiduciary relationship with his employer); Kinzbach Tool Co. v. Corbett–Wallace Corp., 160 S.W.2d 509, 513 (Tex. 1942) (holding that a "trusted" salesman occupied the relationship of a fiduciary to his employer). Here, the jury found the existence of an informal fiduciary relationship when it found that Wilkinson and Taulman each had a "relationship of trust and confidence" with Navigant. Wilkinson and Taulman, who enjoyed broad discretion over almost all aspects of the Claims Practice, do not challenge this finding.

The Texas Supreme Court has stated that it "is impossible to give a definition of the term ['fiduciary'] that is comprehensive enough to cover all cases." Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 199 (Tex. 2002) (quoting Kinzbach, 160 S.W.2d at 512). Generally speaking, though, the term "contemplates fair dealing and good faith" and "refers to integrity and fidelity." Id. "When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency."[4] Abetter Trucking, 113 S.W.3d

---

[4] We recognize that in this case the jury found Wilkinson and Taulman to be fiduciaries based on an informal relationship of trust and confidence, as opposed to a formal relationship such as that between agent and principal. But because the fiduciary duties owed by employees

at 510 (citing Johnson, 73 S.W.3d at 200). "Among the agent's fiduciary duties to his principal are the duty not to compete with the principal on his own account in matters relating to the subject matter of the agency and the duty to deal fairly with the principal in all transactions between them." Id. "The employee has a duty to deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business." Id. (citing Bray v. Squires, 702 S.W.2d 266, 270 (Tex. App.—Houston [1st Dist.] 1985, no writ)).

"However, courts have been and should be careful in defining the scope of the fiduciary obligations an employee owes when acting as the employer's agent in the pursuit of business opportunities." Johnson, 73 S.W.3d at 201. "[A]n employer's right to demand and receive loyalty must be tempered by society's legitimate interest in encouraging competition." Id. (citing Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419–20 (Mass. 1991)). Thus, under Texas law, an at-will employee "may properly plan to go into competition with his employer and may take active steps to do so while still employed." Id. "Such an employee has no general duty to disclose his plans to his employer." Id. Even the existence of a fiduciary relationship between employee and employer "does not preclude the fiduciary from making preparations for a future competing business venture; nor do such preparations necessarily constitute a breach of fiduciary duties." Abetter Trucking, 113 S.W.3d at 510 (citing Bray, 702 S.W.2d at 270). But, as the Texas Supreme Court has explained, the right to prepare to compete with one's employer is not absolute:

> There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. . . . He may not

to employers are most often analyzed in the context of the agent–principal relationship, our evaluation of the scope of Wilkinson and Taulman's fiduciary duties is informed by the law relating to the duties of an employee acting as an agent in the scope of his employer's business.

appropriate his employer's trade secrets. . . . He may not solicit his employer's customers while still working for his employer . . . , and he may not carry away certain information, such as lists of customers. . . . Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer.

Johnson, 73 S.W.3d at 202 (omissions in original); see also Abetter Trucking, 113 S.W.3d at 512 ("The employee may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer[;] or (4) carry away confidential information, such as customer lists."); RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. b (2006) ("[T]he tactics that an agent may use in competing or preparing to compete are subject to legal limits. . . . The actions of . . . agents may become wrongful when they constitute concerted action designed with the purpose of leaving the principal in the lurch.").

We pause to take stock of the delicate position occupied by an employee who leaves his job to compete with his employer. As the Restatement (Third) of Agency notes, "[i]n retrospect it may prove difficult to assess the propriety of a former agent's conduct because many actions may be proper or improper, depending on the intention with which the agent acted and the surrounding circumstances." RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. c. The danger, of course, is that "when elements of the agent's conduct are dissected in detail in litigation following the agent's departure, the dissection is performed with after-the-fact knowledge that the agent became a competitor of the principal, a fact that inevitably shades how the agent's predeparture conduct is interpreted." Id.

1.    Sufficiency of the Evidence of a Breach of Fiduciary Duty

Wilkinson and Taulman argue that the evidence at trial was insufficient to support the jury's findings that they breached their fiduciary duty. Navigant contends that Wilkinson and Taulman breached their fiduciary duty by attempting to sell the Claims Practice for their own benefit, disclosing Navigant's confidential information to its competitors, soliciting Navigant's employees, and failing to disclose their plan to sell the Claims Practice before Navigant committed to the four-year Thanksgiving Tower lease.

There can be no question that the first three actions, if proved, would constitute a breach of fiduciary duty. An employee in a position of trust and confidence who attempts to sell his employer's business for personal gain violates the most basic norms of fair dealing and good faith, and the disclosure of confidential information and solicitation of employees are among the conduct specifically proscribed by Johnson and Abetter Trucking. The fourth action, which might be characterized as failing to disclose a plan to compete when an employer commits to a new lease, presents a more difficult question.

At the very minimum, a fiduciary who negotiates on behalf of his employer must disclose any adverse interest in the matter of the negotiation. See Kinzbach, 160 S.W.2d at 509; Abetter Trucking, 113 S.W.3d at 511. Beyond that, he also "has a duty to deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business." Abetter, 113 S.W.3d at 510. But, on the other hand, an employee who plans to compete with his employer has no general duty to disclose his plans. Johnson, 73 S.W.3d at 201. The Restatement explains:

> In general, an employee or other agent who plans to compete with the principal does not have a duty to disclose this fact to the principal. To be sure, the fact that an agent has such a plan is information that a principal would find useful, but the agent's fiduciary duty to the principal does not oblige the agent to make

10

such disclosure. . . . In this respect, the social benefits of furthering competition outweigh the principal's interest in full disclosure by its agents.

However, an agent has a duty not to mislead the principal about the agent's intentions. An agent's silence may mislead the principal when, for example, the agent knows that the principal is about to embark on an expansion in the principal's business in which the agent will play a crucial role that will not easily be replicated once the agent departs.

RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. c. Thus, the rule is that generally a fiduciary is not required to disclose his plans to compete, but that some circumstances may require disclosure. An assessment of the propriety of an employee's conduct under this sort of standard seems particularly susceptible to being "shaded" by after-the-fact knowledge, as described by the Restatement, so we must be particularly vigilant in our examination of the evidence that was before the jury relating to the lease.

In the instant case, the jury had a sufficient basis to conclude that Wilkinson and Taulman breached their fiduciary duties, including by failing to disclose their plans when the lease was signed. The testimony and evidence at trial showed that beginning in April 2001, Wilkinson and Taulman made proposals to sell the Claims Practice to a number of Navigant's competitors. Wilkinson and Taulman testified that these proposals were made without Navigant's knowledge or authorization. The proposals promised the delivery of "all, or virtually all" of the Claims Practice's clients, as well as "accompanying employees," in exchange for a payment to a corporation owned by Wilkinson and Taulman. Wilkinson testified that none of the proposals provided that Navigant would receive any of the proceeds from the contemplated sale of the Claims Practice.

Further, as noted earlier, the proposals provided detailed information about the Claims Practice, including revenue projections, backlog estimates, margin rates, descriptions of current and potential engagements, specific information about the roles and responsibilities of named management-level employees, and more general information about the other employees. Five of Navigant's competitors received information of this type. Navigant's corporate controller testified that he had reviewed the information in the proposals, and that much of it was information that Navigant considered proprietary and confidential. Wilkinson testified that the financial projections were "internal work," and that the information relating to expenses, gross margins, and the like was not generally public or published. Wilkinson also marked the proposals "confidential," and had sought a confidentiality agreement from at least one competitor who was to receive a proposal.[5]

Additionally, in connection with the proposal to sell the Claims Practice to PWC, Wilkinson and Taulman invited PWC representatives to Navigant's Dallas office and introduced them to Navigant employees. In early June 2002, at a similar meeting in the Dallas office with representatives from Rust, Wilkinson and Taulman again introduced Navigant employees to the visiting competitor. On June 26, 2002, also in connection with the proposal to Rust, Wilkinson and Taulman brought a Navigant employee to Minneapolis to interview with Rust. Taulman testified that the trip to Minneapolis was not on Navigant business, and that she later reimbursed Navigant for the cost of her plane ticket, which was inadvertently expensed to Navigant.

In May 2001, Wilkinson signed, on Navigant's behalf, a four-year lease for office space in Thanksgiving Tower in downtown Dallas. The record indicates

---

[5] This agreement defined "confidential information" as "certain valuable client relationships, engagement opportunities, marketing strategies, pricing strategies, technical solutions, operational procedures, organizational structure, employee relationships and other business information that is considered confidential and proprietary."

that Wilkinson took a lead role in negotiating the lease terms and dealing with the real estate agent, but that he and Taulman reviewed a number of alternatives and recommended the Thanksgiving Tower space to Navigant's corporate office. Navigant's general counsel authorized Wilkinson to sign the lease. Wilkinson testified that at the time he signed the lease, he had not informed Navigant of the proposal to sell the Claims Practice to First Union that had been made the month before, in April 2001. When pressed on the issue, he explained, "I don't think I would have been well-advised to tell [Navigant] I was talking to anybody." Taulman testified that when Wilkinson was signing the lease, she made the decision for herself not to tell Navigant about the First Union offer.

The Thanksgiving Tower lease was also a topic of conversation in a November 2001 conference call between Wilkinson, Taulman, and two other Navigant employees.[6] In this call, a transcript of which appears in the record, Wilkinson described the possibility of buying the Claims Practice from Navigant. He explained that a "reasonable" deal would be to give Navigant ten percent of the Claims Practice's collected receivables for a few years, purchase the Dallas office's fixtures, furniture, and equipment, and assume "certain payables that they need to get rid of." Wilkinson explained that the lease was significant because the Claims Practice was Navigant's only business in Dallas, meaning that Navigant would "be stuck with four years of an entire floor of a downtown office building," with "no way to absorb it."[7] Wilkinson would therefore offer to

---

[6] These were individuals from outside of the Claims Practice who were also thinking about leaving Navigant.

[7] The entire portion of the conversation is as follows:
Wilkinson:    In our particular instance, there is no user down here. I don't know that there is where you are.
Employee #1: What do you mean no –
Employee #2: No, like someone that would take (inaudible).
Wilkinson:    They'd be stuck with four years –

effectively assume Navigant's liability on the lease by subleasing it back from Navigant. As an added benefit, this would allow him to keep the business in the same space, which Navigant would no longer have a use for: "And since I was talking about subleasing anyway, you know it would only be a dog in the manger to say no, you must leave."

Further relevant to the lease was Wilkinson's September 24, 2002, meeting with two Navigant corporate officers in Chicago, in which Wilkinson proposed a variation of the deal he had described in the November 2001 phone call. Navigant's general counsel testified that at this meeting Wilkinson offered to "take the business off [Navigant's] hands in exchange for an assumption of the Thanksgiving Tower lease." In a document Wilkinson prepared in anticipation of the meeting, he laid out his "range of negotiating points" with Navigant. The document essentially listed the ongoing liabilities associated with the Claims Practice that Navigant would be responsible for if it refused to agree to a deal on Wilkinson's proposed terms and the business were merely dissolved. With regard to the lease, Wilkinson's "opening position" was that he would get his own lease for the business. This created "negotiating leverage" because Navigant "must honor ongoing lease of vacant 36th floor." Wilkinson's "closing position" was to assume the lease from Navigant.[8] Wilkinson estimated the value of the assumed liability for the lease to be $1.35 million. At trial, when asked what he meant by "leverage," the following exchange occurred:

> Employee #1: Oh, right, right. I'm with you.
> Wilkinson: – of an entire floor of a downtown office building.
> Employee #1: Same here, there would be no user.
> Wilkinson: So there is no way to absorb it.

[8] Other "negotiating points" included an unprofitable contract with "negative cash flow" that Wilkinson would leave with Navigant, as well as severance and accrued vacation payments that would have to be made to most of Navigant's employees, who would be hired away.

Wilkinson: What I mean by leverage, issues that would allow them [Navigant] or encourage them to make decisions.

Plaintiff's counsel: I can go with that. So you wanted to encourage them to make decisions in your favor, and these were things that you were looking at that would help encourage them to go your way.

Wilkinson: I wanted to encourage them to be counteroffers, yes, and that would be in my favor.

Based on the foregoing evidence, there was a sufficient basis for the jury to conclude that in attempting to sell the Claims Practice, Wilkinson and Taulman breached their obligation of fair dealing and good faith, and in the process disclosed Navigant's confidential information. The jury could have concluded that their acts of introducing Navigant employees to competitors' representatives and flying an employee to interview with a competitor rose to the level of solicitation. There was also sufficient evidence for the jury to conclude that Wilkinson and Taulman breached their fiduciary duty by failing to disclose their plan to sell the Claims Practice before the lease was signed. We do not mean to suggest that the mere fact that an employer signs a new lease gives rise to a duty of disclosure in all employees who have plans to compete with the employer. But in this case, Wilkinson and Taulman were the two top employees in the Dallas office, and they had active roles in negotiating, recommending, and signing the lease. There was also evidence that the plan to compete was itself wrongful, and that part of this plan was to use the lease as leverage against Navigant in future negotiations to acquire the Claims Practice on favorable terms. The reasonable inference for the jury to draw was that Wilkinson and Taulman had a conflict of interest on the lease, because though they were charged to act for Navigant's benefit when recommending it, they also had an interest in seeing Navigant burdened with a liability that they could use as leverage against it in the future. Given these specific facts, the jury was

entitled to conclude that Wilkinson and Taulman's failure to disclose their activities before Wilkinson signed the lease constituted a breach of fiduciary duty.

2.    Sufficiency of the Evidence of Proximately Caused Damages

Wilkinson and Taulman also argue that there is insufficient evidence to support the jury's findings that their breaches of fiduciary duty proximately caused Navigant damage.  Navigant sought damages associated with its liability on the Thanksgiving Tower lease and the value of the Claims Practice.

As a preliminary matter, the parties disagree over the appropriate standard of review.  Navigant argues that Wilkinson and Taulman waived the right to challenge the sufficiency of the evidence on the issue of proximate cause by failing to raise this issue in their Rule 50(a) motion at the close of evidence. The district court considered and denied judgment as a matter of law on this issue when it was raised in Wilkinson and Taulman's post-verdict Rule 50(b) motion, so Navigant really argues that the district court erred in considering it there.  See FED. R. CIV. P. 50(b).  Wilkinson and Taulman point to statements made in the Rule 50(a) motion and at the charge conference that they contend were sufficient to preserve this issue for appeal.

Generally, a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives both its right to present a Rule 50(b) motion after judgment and its right to challenge the sufficiency of the evidence on appeal.  See FED. R. CIV. P. 50(b); Flowers, 247 F.3d at 238.  However, Rule 50(b) is construed liberally, and we may excuse "technical noncompliance" when the purposes of the rule are satisfied.  Scottish Heritable Trust, PLC v. Peat Marwick Main & Co., 81 F.3d 606, 610 (5th Cir. 1996).  "[T]he two basic purposes of this rule are 'to enable the trial court to re-examine the question of evidentiary insufficiency as a matter of law if the jury returns a verdict contrary to the movant, and to alert the opposing party to the insufficiency before the case is submitted to the

16

jury.'" Id. (quoting MacArthur v. Univ. of Tex. Health Ctr., 45 F.3d 890, 897 (5th Cir. 1995)). In addition, a "defendant's objection to proposed jury instructions on grounds pertaining to the sufficiency of the evidence issues it seeks to appeal may satisfy these purposes." Id.

Our examination of the record convinces us that although Wilkinson and Taulman failed to explicitly move for judgment as a matter of law on the issue of proximate cause for the breach of fiduciary duty claim, their Rule 50(a) motion and objections to the jury instructions sufficiently addressed this issue to serve the purposes of Rule 50(b) and preserve it for appeal. In their objections to the jury instructions, Wilkinson and Taulman objected to the instruction for damages caused by the breach of fiduciary duty on the grounds that there was no evidence, or insufficient evidence, of damages to the Claims Practice. Further, as part of the Rule 50(a) motion, Wilkinson and Taulman argued with regard to the breach of contract claims that there was insufficient evidence to support a finding that Navigant's damages were caused by the disclosure of confidential information or any other breach of contract. Finally, in an objection to the instruction for the misappropriation of trade secrets claim, Wilkinson and Taulman argued that Navigant's theory of recovery "assumes a degree of causation that hasn't been established."

We believe the objection to the jury instruction on breach of fiduciary duty damages was sufficient to alert the district court and Navigant to Wilkinson and Taulman's contention that there was insufficient evidence to find that Navigant's damages were proximately caused by a breach of fiduciary duty. In addition, the Rule 50(a) motion and objections to the jury charge raised the same argument in the context of the breach of contract and misappropriation of trade secrets claims. Since the conduct that formed the basis for these claims—disclosure of confidential information and solicitation of employees—formed at least a portion of the basis for the breach of fiduciary duty

17

claim, these arguments also served as notice that Wilkinson and Taulman believed the evidence of this conduct insufficient to support a finding of proximate cause for breach of fiduciary duty. Accordingly, we conclude that Wilkinson and Taulman did not waive their right to challenge the sufficiency of the evidence on appeal. The proper standard of review is therefore the de novo standard articulated above.

Wilkinson and Taulman argue that all of Navigant's claimed damages were caused solely by the fact that Wilkinson and Taulman resigned and some of their clients followed them to a new firm. Specifically, they argue that there was no evidence that Navigant suffered any damages proximately caused by the disclosure of confidential information or solicitation of employees. They do not contest the evidence of proximate cause as it relates to damages caused by Navigant's liability on the Thanksgiving Tower lease.

Proximate cause consists of two elements, foreseeability and cause in fact. McClure v. Allied Stores of Tex., Inc., 608 S.W.2d 901, 903 (Tex. 1980); see also Baker Botts, L.L.P. v. Cailloux, 224 S.W.3d 723, 734 (Tex. App.—San Antonio 2007, pet. denied) (discussing proximate cause in the breach of fiduciary duty context). "Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force." McClure, 608 S.W.2d at 903. "There need not, however, be direct and positive proof, as the jury may infer proximate cause 'from the circumstances surrounding the event.'" Mosley v. Excel Corp., 109 F.3d 1006, 1009 (5th Cir. 1997) (quoting B.M. & R. Interests v. Snyder, 453 S.W.2d 360, 363 (Tex. App.—Tyler 1970, writ ref'd n.r.e.)); see also Havner v. E–Z Mart Stores, Inc., 825 S.W.2d 456, 459 (Tex. 1992) ("[C]ircumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation.").

The evidence at trial showed that confidential information was provided to LECG well in advance of Wilkinson and Taulman's resignations. Further, it

18

showed that LECG used and relied on that information to plan an acquisition of the employees and clients of the Claims Practice. In May 2002, LECG first received a proposal of the type that Wilkinson and Taulman circulated to Navigant's other competitors. As previously described, this document provided a description of the business operations, finances, and employee and client relationships of the Claims Practice. When serious negotiations between Wilkinson and LECG began in late August 2002, Wilkinson sent LECG an "updated proforma" that contained a more detailed set of information. In addition to basic revenue and backlog summaries, this document contained a list of employees, organized by position, with salary and chargeability information. It also broke down the individual revenue projections for each of the Claims Practice's current and projected engagements, and for each engagement named the employee who served as the project manager. An internal LECG email, which instructed recipients to "be discreet," showed that by August 30, 2002—still a month before Wilkinson and Taulman resigned—LECG already had an approximate count of the number of employees who would be part of the "deal" with Wilkinson and Taulman. On September 26, 2002, four days before Wilkinson and Taulman's resignations were to become effective, LECG officials were planning a meeting to talk about "Dallas," a reference to the location of the Claims Practice, and were discussing the estimated revenue base and staffing needs of their anticipated new business.

As discussed above, there was evidence to support a finding that Wilkinson and Taulman solicited Navigant employees before they resigned. There was also evidence that a rapid departure of important Navigant employees shortly after Wilkinson and Taulman resigned left Navigant unable to service its clients.[9]

---

[9] For example, LECG documents indicate that of the Claims Office's six senior consultants (the most senior staff position below principal or director), four moved to LECG in the aftermath of the resignations.

Within days of Wilkinson and Taulman's resignations, a number of Navigant's employees had already accepted offers for employment from LECG, and some had in fact already begun working. Navigant's general counsel testified that because Wilkinson and Taulman "had taken all the key employees" to LECG when they resigned, Navigant was no longer able to service its clients' needs and lost its ability to compete for and retain clients. In an e-mail, a Navigant executive explained that there was "no way" Navigant could keep a particular engagement because all of the key employees on the project had left the firm. One of Navigant's former clients testified that he switched his account to LECG because Navigant was no longer capable of servicing it, but that he would have considered keeping business at Navigant if it had retained the capability and technical employees necessary to perform the work associated with his account. This client also explained that the particular Navigant employee who performed much of the work associated with his account, Cindi Straup, had left for LECG. If she had stayed, the client would have considered keeping his account with Navigant.

Based on the evidence presented at trial, the jury could have concluded that Navigant's damages were in part caused by the fact that Wilkinson and Taulman provided LECG with information that enabled it to compete with Navigant on advantageous terms, thus diminishing Navigant's ability to retain its employees and clients. In addition, the jury was entitled to draw the inference that Wilkinson and Taulman's pre-resignation solicitations of Navigant employees prepared and encouraged them to leave Navigant and follow Wilkinson and Taulman to a competitor once they resigned, which had the effect of further undercutting Navigant's ability to retain its own employees and, thus, its clients.[10]

---

[10] In fact, this appears to have been precisely the case with Cindi Straup, the employee Navigant's former client had identified as an important employee whose departure for LECG

20

Wilkinson and Taulman nonetheless ask us to reject what they claim is an inference of causation based solely on the following chronology of events: (1) Wilkinson and Taulman did bad things before they left; (2) after they left Navigant suffered damages; (3) therefore the bad things Wilkinson and Taulman did must have caused Navigant's damages. But our review of the record convinces us that this rough formulation mischaracterizes Navigant's theory of causation and ignores the facts and reasonable inferences to be drawn from the evidence actually placed in front of the jury. "Alert avoidance of the classical fallacy of post hoc, ergo propter hoc does not require rejection of common sense inferences." Swanner v. United States, 406 F.2d 716, 718 (5th Cir. 1969). We conclude that there was sufficient evidence to support the jury's findings here.

C.   Breach of Contract

Wilkinson and Taulman argue that there is insufficient evidence to support the jury's findings that they breached their contracts with Navigant. Navigant argues that they breached their contracts by disclosing confidential information and soliciting Navigant's employees.

Wilkinson and Taulman were previously principals in a consulting firm that was acquired by a predecessor entity of Navigant in 1998. As part of this acquisition, they signed an agreement (the "1998 Agreement") that, among other things, required them to treat and hold as confidential all of Navigant's "confidential information," as that term was defined, and prohibited them from soliciting any Navigant employee during a certain "restricted" time period. "Confidential information" was defined as:

> any information concerning the businesses and affairs of a Party
> other than any such information that (i) is generally available to or

---

left Navigant unable to service the client's account. She was the employee who Wilkinson and Taulman took to interview with Rust in Minneapolis, and she had been among the employees introduced to Navigant's competitors in the Dallas office.

known by the public immediately prior to the time of disclosure (except through the actions or inaction of the Person to whom disclosure has been made by or on behalf of such Party) or (ii) has been acquired or developed independent from such Party.

In late October 2000, Wilkinson and Taulman agreed to participate in a "value sharing program" that granted cash and stock to key employees who extended their noncompete agreements with NCI. Wilkinson and Taulman signed an agreement (the "VSP Agreement") extending the term of the noncompete portion of the1998 Agreement, which included the ban on soliciting employees, through the later of either March 1, 2002, or the termination of their employment with NCI. The VSP Agreement also made the cash and stock grants administered under the program contingent upon continued abidance by the terms of the 1998 Agreement, and required forfeiture of all awards received under the program in the event of a breach.

Navigant contends that Wilkinson and Taulman breached the VSP Agreement, and thus must forfeit all awards received under the program, by disclosing Navigant's confidential information and soliciting Navigant's employees in violation of the terms of the 1998 Agreement.[11] We have already discussed, and see no need to repeat here, the circumstances of the distribution of the proposals and the character of the information they contained; suffice it to say that there was sufficient evidence for the jury to conclude that Wilkinson and Taulman violated the provision of the 1998 Agreement relating to confidential information.[12] Likewise, for the reasons discussed above, we also

---

[11] The parties stipulated that the relevant contracts were valid.

[12] Wilkinson and Taulman argue that the information in the proposals does not fall within the 1998 Agreement's definition of "confidential information," which excludes information "acquired or developed independently," because it was "generated" by Wilkinson and Taulman. While Wilkinson and Taulman certainly prepared the proposals, there was ample evidence for the jury to conclude that the information itself was Navigant's proprietary

22

conclude that there was sufficient evidence to support a finding that the provision relating to the solicitation of employees was violated.

D.   Misappropriation of Trade Secrets

Wilkinson and Taulman challenge the sufficiency of the evidence supporting the jury's verdict on the misappropriation of trade secrets claim. The district court declined to address this issue when it was presented in the Rule 50(b) motion because the court eliminated the awards of damages for misappropriation of trade secrets as duplicative of the awards for breach of fiduciary duty. In light of our decision upholding the verdict on the breach of fiduciary duty claim, we likewise decline to address the misappropriation of trade secrets claim.

E.   Exemplary Damages

Wilkinson and Taulman argue that the jury's awards of exemplary damages should be reversed because there was insufficient evidence of fraud or malice. Navigant claims that this issue is waived because it was not presented in Wilkinson and Taulman's Rule 50(a) motion at the close of evidence. Our review of the record confirms that this issue was not raised in the Rule 50(a) motion. We therefore review the awards of exemplary damages only for plain error. See Lincoln v. Case, 340 F.3d 283, 290 (5th Cir. 2003). "Under plain error review, we must decide 'whether there was any evidence to support the jury verdict.'" Id. (quoting Flowers, 247 F.3d at 238). "If any evidence exists that supports the verdict, it will be upheld." Id.

As discussed previously, there was evidence that Wilkinson and Taulman were trusted employees who attempted to sell Navigant's business for their own gain, disclosed Navigant's confidential information to its competitors, solicited Navigant's employees, and used an expensive lease that they had recommended

---

information and only available to Wilkinson and Taulman because of their affiliation with Navigant, and thus not "acquired or developed independently."

23

as negotiating leverage against their employer. The jury found that the harm to Navigant resulted from malice or fraud on the part of both Wilkinson and Taulman. We conclude that there was evidence to support the awards of exemplary damages.

## III. JURY INSTRUCTIONS

Wilkinson and Taulman argue that they are entitled to a new trial because the district court's jury instruction on breach of fiduciary duty erroneously placed the burden of persuasion on them and was internally inconsistent. At trial, the jury was instructed, in relevant part, as follows:

> Because you have found that a relationship of trust and confidence existed between a Defendant and Navigant, the Defendant owed Navigant a fiduciary duty. To prove he complied with his duty, the Defendant must show the following by a preponderance of the evidence: . . . 5. The Defendant fully and fairly disclosed all important information to Navigant concerning the transaction.
>
> Under Texas law, an employee has a duty to act primarily for the benefit of the employer in matters connected with his employment. For example, an employee has the duty not to compete with his employer on his own account in matters relating to the subject matter of the employment and the duty to deal fairly with his employer in all transactions between them.
>
> On the other hand, balanced against those duties is the employee's right to compete with his employer. An employee may take active steps to compete with his employer even while still employed and has no general duty to disclose his plans to his employer.

After this instruction, the jury was asked the following question: "Did the following Defendants prove by a preponderance of the evidence that they

24

complied with their fiduciary duty toward Navigant?" The jury answered "no" for both Wilkinson and Taulman.

Wilkinson and Taulman now argue that the instruction was flawed in two ways. They contend that the instruction (along with the corresponding question) improperly placed the burden of persuasion on them, as the fiduciaries, to show that they complied with their fiduciary duty. They also assert, as a more general matter, that the instruction was internally inconsistent because it required them to show that they "fully and fairly disclosed all important information," but also stated that an employee "has no general duty to disclose his plans [to compete] with his employer." These statements, they contend, are fundamentally inconsistent. In response, Navigant argues that the instructions accurately stated the law.

A.   Standard of Review

We generally apply a two-part test in considering a challenge to the district court's jury instructions. "The party challenging the instructions must first 'demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" Russell v. Plano Bank & Trust, 130 F.3d 715, 719 (5th Cir. 1997) (quoting Bender v. Brumley, 1 F.3d 271, 276 (5th Cir. 1993)). "Second, even where a jury instruction was erroneous, 'we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.'" Id. (quoting Bender, 1 F.3d at 276).

"A prerequisite to our review of the instructions in this manner, however, is that the objection must have been brought to the attention of the district court at trial." Id. (citing 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2553 (2d ed. 1995)). Rule 51 of the Federal Rules of Civil Procedure requires that a party objecting to jury instructions "must do so on the record, stating distinctly the matter objected to and the grounds of the

objection." Fᴇᴅ. R. Cɪᴠ. P. 51(c).  At oral argument, we questioned whether Wilkinson and Taulman's objection at trial was sufficient to preserve error on the issue of the burden of persuasion.  After further review of the record, we conclude that it was not.

The district court gave the parties two opportunities to object to the jury instructions on the record.  At the close of evidence, the court provided the parties with a preliminary version of the jury instructions and invited objections, additions, and suggestions.  The following day, the court gave the parties the final version of the instructions, asked for the parties' final objections and comments, and made clear rulings on the objections.  During the preliminary charge conference, Wilkinson and Taulman's attorney made the following objections to the breach of fiduciary duty jury charge (emphasis added):

> Counsel: On the instructions for breach of fiduciary duty, on page 1 we object to the five numbered items.  We believe that they run a severe risk of misleading the jury and that they do not correctly reflect the Defendants' rights under the Abetter decision that we discussed.
>
> The Court: And they do come straight from the patterns.
>
> Counsel: Yes, Your Honor.  But we believe that the Abetter case raises implications that these could unfairly influence the jury to disregard the proper standard, which is set out in the Abetter case, and, we believe, in the remainder of the charge.  The final paragraph on page 13, ". . . those duties are the employees' right to properly plan," we believe that properly plan is dangerously misleading and could be construed as a comment on the evidence. The Abetter case does not offer that clarification, properly.
>
> * * *
>
> The Court: . . . What else?

Counsel: We object to the burden on Question Number 6. And also, we would request that the Plaintiff be required to specify the transactions that are at issue. As the instructions previously note, the fiduciary duties all related to certain specified transactions. Yet we don't know which transactions the Plaintiffs are pleading.

Wilkinson and Taulman's attorney continued on with several more objections relating to the instructions for damages and the misappropriation of trade secrets claim, and the court did not respond to the objection to the burden. The italicized sentence above was the only reference to the issue of the burden. When the final version of the instructions was given to the parties the following day, Wilkinson and Taulman's attorney objected to a number of aspects of the instruction on breach of fiduciary duty, but not the burden.

It has long been the rule that an "objection must be sufficiently specific to bring into focus the precise nature of the alleged error." Delancey v. Motichek Towing Serv., Inc., 427 F.2d 897, 900 (5th Cir. 1970) (citing Palmer v. Hoffman, 318 U.S. 109 (1943)). "The grounds must be stated with sufficient clarity so that the trial court may follow and understand them if well taken." 9A WRIGHT & MILLER, supra, § 2554. Here, the objection to the instruction's burden of persuasion was not specific enough to bring into focus the precise nature of the alleged error that Wilkinson and Taulman now complain of, which we explain in further detail below. It therefore failed to satisfy the requirements of Rule 51.

The jury instruction used by the district court was based on Texas pattern jury charge 104.2 ("PJC 104.2"), which places the burden of persuasion on the fiduciary to prove that he complied with his fiduciary duty. See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment PJC 104.2. Under Texas law, where a fiduciary engages in a transaction with a party to whom the fiduciary owes duties, a presumption of unfairness arises, and the burden is placed on the

fiduciary to establish that the transaction was fair. Miller v. Miller, 700 S.W.2d 941, 947 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). The comment to PJC 104.2 explains that it "submits the question of breach of fiduciary duty, whether that duty is based on a formal or informal relationship, where it is alleged that the fiduciary has profited or benefitted from a transaction with the beneficiary." Texas Pattern Jury Charges, supra, PJC 104.2 cmt. However, where there is no transaction between the fiduciary and principal, there is no presumption of unfairness, and the burden of proof does not shift to the fiduciary. See Amwest Sav. Ass'n v. Statewide Capital, Inc., 144 F.3d 885, 891 (5th Cir. 1998). Recognizing this point, the comment to PJC 104.2 instructs that "in those cases where the presumption of unfairness does not arise and the burden of persuasion does not shift to the fiduciary," the question and instruction should be modified to place the burden of persuasion on the plaintiff. Texas Pattern Jury Charges, supra, PJC 104.2 cmt.

In their brief on appeal, Wilkinson and Taulman argue that because they did not buy from or sell anything to Navigant, or obtain commissions from both sides in a deal, they did not engage in a transaction with Navigant. Therefore, they argue, the presumption of unfairness did not arise in this case, and the pattern jury charge should have been modified to place the burden of persuasion on Navigant.

"The purpose of [Rule 51] is to enable the trial court to correct any error it may have made before the jury begins its deliberations and thus avoid the necessity of a new trial." Pierce v. Ramsey Winch Co., 753 F.2d 416, 424 (5th Cir. 1985) (citation omitted). Because Wilkinson and Taulman failed to state the grounds for their objection to the burden, their position was never made clear to the district court.[13] They failed to explain that for the burden to be placed on the

---

[13] In fact, even Wilkinson and Taulman's post-verdict motion for new trial did not clearly call the district court's attention to the argument that they now make on appeal. In

fiduciary, the fiduciary must have engaged in a transaction with his principal that gives rise to the presumption of unfairness. Had this been brought to the attention of the district court, it could have invited argument from the parties on the question of whether Wilkinson and Taulman's activities could be considered "transactions" giving rise to the presumption of unfairness. As it was, the district court was never given a chance to address this issue, and the purpose of Rule 51 was not satisfied. Because Wilkinson and Taulman did not preserve error on this issue, we review it for plain error only.

To prevail under the plain error standard, a party must show "that the instructions made an obviously incorrect statement of law that was probably responsible for an incorrect verdict, leading to substantial injustice." Positive Black Talk, Inc. v. Cash Money Records, Inc., 394 F.3d 357, 369 (5th Cir. 2004) (quoting Hernandez v. Crawford Bldg. Material, 321 F.3d 528, 531 (5th Cir. 2003)). Under this standard, "we are exceedingly deferential to the trial court." Id.

B.     Application of the Plain Error Standard to the Challenge to the Placement of the Burden of Persuasion on Wilkinson and Taulman

On plain error review, Wilkinson and Taulman first must show that the instruction placing the burden of persuasion upon them was an obviously incorrect statement of law. See id. at 369. They argue that it was error to place the burden on them because there was no predicate transaction that could give

---

that motion, Wilkinson and Taulman identified the rule that when a fiduciary engages in a transaction with his principal, a presumption of unfairness arises that shifts the burden of persuasion to the fiduciary. However, they did not argue, as they do now, that the failure to place the burden on Navigant was independent error entitling them to a new trial. Rather, they asserted that: (1) PJC 104.2 was inapplicable in cases where the presumption of unfairness does not arise; and (2) its use in the instant case was the "source" of the alleged inconsistency in the charge that imposed no "general duty" on an employee to disclose his plans to compete, but required full and fair disclosure of all important information. Of course, the pattern jury charge is not entirely inapplicable in cases where the presumption of unfairness does not arise; as Wilkinson and Taulman now recognize in their briefs on appeal, in such cases the jury charge should simply be modified to place the burden of persuasion on the other party.

rise to the presumption of unfairness. In response, Navigant argues that various aspects of Wilkinson and Taulman's conduct justify imposing the presumption of unfairness, including their recommendation of the Thanksgiving Tower lease, Wilkinson's negotiations with Navigant's corporate office, and the de facto delivery of the Claims Practice to LECG.

Johnson v. Peckham, the leading case in this area, concerned the fiduciary duties of a partner who was purchasing his co-partner's interest in their partnership. 120 S.W.2d 786 (Tex. 1938). The Texas Supreme Court held that "[s]uch a sale will be sustained only when it is made in good faith, for a fair consideration and on a full and complete disclosure of all important information as to value." Id. at 787. "Following this decision, Texas courts have applied a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure, thus casting on the fiduciary the burden of fairness." Miller, 700 S.W.2d at 946.

The presumption of unfairness has been applied in a variety of circumstances. Paradigmatic cases might be said to include, in addition to the partner who purchases his co-partner's interest, the attorney who takes a deed from his client, or the agent who obtains a gift from his principal. See Tex. Bank & Trust Co. v. Moore, 595 S.W.2d 502, 507–08 (Tex. 1980); Archer v. Griffith, 390 S.W.2d 735, 739 (Tex. 1965). However, the presumption of unfairness has also arisen in situations where a transaction between the fiduciary and the one to whom duties are owed is less readily identifiable. See Stephens County Museum, Inc. v. Swenson, 517 S.W.2d 257, 260 (Tex. 1975) (placing the burden on a museum to show the fairness of gifts made by two sisters, where their brother handled their affairs and was also an officer of the museum). Additionally, the Texas Supreme Court has stated that when examining transactions involving a corporate fiduciary who derives personal profit through dealings with the corporation or its property, "the form of the transaction will give way to the

substance of what actually has been brought about." Int'l Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, 577 (Tex. 1963). This maxim applies equally to employees with fiduciary duties. See Herider Farms–El Paso, Inc. v. Criswell, 519 S.W.2d 473, 477 (Tex. App.—El Paso 1975, writ ref'd n.r.e.).

Wilkinson and Taulman's activities do not easily fit into the classical mold of a transaction between an agent and principal or attorney and client. However, Texas law clearly contemplates that the presumption of unfairness can arise in a variety of situations, and counsels us to look past form to the substance of what was actually brought about. Wilkinson and Taulman caused Navigant to enter into an expensive lease that they then tried to use against Navigant as leverage in negotiations. We are admittedly uncertain about whether the substance of this transaction can justify placing the burden on Wilkinson and Taulman, rather than Navigant. However, that is not the question we must answer; we need only decide whether the placement of the burden on Wilkinson and Taulman was "obviously incorrect." Based on the record before us, we cannot say that it was.

Second, even if we were to assume that the instruction was obviously incorrect, Wilkinson and Taulman's argument would still fail, because they cannot show that the instruction was "probably responsible for an incorrect verdict, leading to substantial injustice." Positive Black Talk, 394 F.3d at 369. In addition to breach of fiduciary duty, the jury found Wilkinson and Taulman liable for breach of contract and misappropriation of trade secrets. These claims were based on much of the same conduct underlying the breach of fiduciary duty claim, and Navigant bore the burden of persuasion on both. Moreover, the jury awarded exemplary damages against both Wilkinson and Taulman, which required findings by clear and convincing evidence that the harm from breach of fiduciary duty or misappropriation of trade secrets resulted from malice or

fraud. In the face of these findings, Wilkinson and Taulman have not shown plain error.

C.    The Objection to the Instruction as Internally Inconsistent

Wilkinson and Taulman also argue that the breach of fiduciary duty instruction was internally inconsistent, confusing, and contrary to Texas law because the instruction required them to show that they "fully and fairly disclosed all important information to Navigant concerning the transaction," but also stated that an employee "has no general duty to disclose his plans [to compete] with his employer." Essentially, Wilkinson and Taulman complain that the jury instruction did not accurately set forth the law as articulated in Abetter Trucking. This error was preserved at trial, so our standard of review is the two-part test whereby Wilkinson and Taulman must first show that the charge creates substantial doubt as to whether the jury was properly guided. See Russell, 130 F.3d at 719. Even if the charge was erroneous, we will not reverse if the instruction could not have affected the outcome of the case. Id.

In Abetter Trucking, the court stated that an employee has a duty to deal openly with his employer and to fully disclose to the employer information about matters affecting the company's business. 113 S.W.3d at 510. However, the court also stated that an employee who plans to compete with his employer "has no general duty to disclose his plans." Id. These statements are not fundamentally inconsistent, as Wilkinson and Taulman claim, but rather reflect the "tension between the obligations of a fiduciary and his rights as a potential competitor." Id. The jury was properly instructed on this claim.

IV. ATTORNEY'S FEES

Taulman appeals the award of $574,149.60 in attorney's fees against her. We review the district court's award of attorney's fees for abuse of discretion, although conclusions of law underlying the award are reviewed de novo. Volk v. Gonzalez, 262 F.3d 528, 534 (5th Cir. 2001).

32

In the relevant portion of this lawsuit, Navigant brought seven causes of action against three defendants, one of whom was subsequently dismissed. Texas law allows the recovery of attorney's fees for only one of those causes of action, breach of contract. See TEX. CIV. PRAC. & REM. CODE Ann. § 38.001 (Vernon 1997). The district court determined that Navigant failed to present its claim for attorney's fees against Wilkinson, see id. § 38.002, so it only awarded fees against Taulman.

The general rule regarding the recovery of fees in Texas is that "fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 311 (Tex. 2006). However, in Stewart Title Guaranty Co. v. Sterling, the Texas Supreme Court recognized that an "exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." 822 S.W.2d 1, 11 (Tex. 1991) (citation and internal quotation omitted). A party who can meet this exception is not required to segregate fees and may recover the entire amount of fees covering all claims. Id. During the pendency of the appeal of this case, the Sterling exception was modified as follows by Chapa:

> Intertwined facts do not make tort [attorney's] fees recoverable; it
> is only when discrete legal services advance both a recoverable and
> unrecoverable claim that they are so intertwined that they need not
> be segregated. We modify Sterling to that extent.

Chapa, 212 S.W.3d at 313–14.

Navigant did not segregate its fees and argued to the district court that segregation was not required because its recoverable and nonrecoverable claims were inextricably intertwined under the Sterling standard. The district court

33

determined that some, but not all, of Navigant's claims were intertwined, that segregation of its fees was not possible, and that Navigant was entitled to 60% of its fees. Taulman now argues that in light of Navigant's failure to segregate its fees, the district court abused its discretion in awarding a percentage. But the failure to segregate does not mean that a party cannot recover any of its attorney's fees. Id. at 314. In such instances, "[u]nsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be." Id. (citing Sterling, 822 S.W.2d at 12). The district court, as the trier of fact on the question of attorney's fees,[14] did not abuse its discretion in awarding a percentage of Navigant's fees rather than denying recovery of fees completely. See Sterling, 822 S.W.2d at 12 ("The determination of reasonable attorney's fees is a question for the trier of fact.").

As required by Sterling, the district court examined the facts and proof in the case to see whether the issues were inextricably intertwined. After determining that all of Navigant's claims were not inextricably intertwined, it awarded fees based on its assessment of the extent to which the claims were intertwined. However, as noted above, the Texas Supreme Court has since ruled that intertwined facts do not make fees recoverable; rather, the question under Chapa is whether discrete legal services advance both a recoverable and unrecoverable claim. See Chapa, 212 S.W.3d at 313–14. Remand is therefore appropriate for consideration of the award of fees under the new standard established in Chapa.[15]

## V. TESTIMONY OF NAVIGANT'S CONTROLLER

---

[14] The parties agreed to submit the question of attorney's fees to the court.

[15] We note that the district court appeared to base its assessment of whether Navigant's claims were intertwined at least in part on a consideration of whether the work performed by Navigant's attorneys on particular claims was related to Taulman's breach of contract. See Mem. Order Granting in Part and Denying in Part Plaintiff's Motion for Attorney's Fees (doc. no. 293), at 18.

Wilkinson and Taulman assert that they are entitled to a new trial because the district court erred in permitting Navigant's controller to testify that revenue figures in one of the proposals prepared by Wilkinson and Taulman matched figures in an internal Navigant document that was not put into evidence.[16] They argue that this testimony was hearsay and violated Federal Rule of Evidence 1002, the "best evidence rule." Navigant argues that error on this point has been waived because the controller was allowed to testify, without objection, that the information contained in the proposals was confidential to Navigant, and also because when Wilkinson and Taulman subsequently objected to the testimony, they only did so on hearsay grounds.

The record shows Wilkinson and Taulman clearly objected to portions of the controller's testimony on hearsay grounds. However, as the district court noted, the testimony was not hearsay, because it was not offered to prove the truth of the information in the proposals or in Navigant's internal documents, but rather to show that the same figures were used in both documents. Wilkinson and Taulman appear to argue that they preserved error on the best evidence issue with the following objection to the controller's testimony on redirect: "He's referring to another document that's not in evidence. It's all hearsay." We have our doubts that this objection was sufficient to preserve error on the best evidence issue, as Wilkinson and Taulman seemed to be invoking the out-of-evidence document in support of their hearsay objection, as an explanation that an out-of-court statement was made, rather than as a separate objection.[17] However, even if the error, if any, was preserved, it was harmless, as the controller had previously testified that the proposals contained Navigant's

---

[16] This testimony was elicited by Navigant to show that the information disclosed by Wilkinson and Taulman in the proposals was confidential.

[17] Wilkinson and Taulman had explained an earlier hearsay objection in similar terms: "He's referring to unidentified documents that have not been introduced, and those are out-of-court statements."

confidential information without making reference to any out-of-court documents, and there was ample other evidence showing that the information disclosed by Wilkinson and Taulman was confidential to Navigant. The district court did not abuse its discretion in denying a new trial on the basis of the controller's testimony.

## VI. DUPLICATIVE DAMAGES

Finally, Wilkinson and Taulman argue that the awards against them for breach of fiduciary duty are duplicative. The jury awarded $1,500,000 against Wilkinson and $1,500,000 against Taulman for breach of fiduciary duty.

Our standard of review on this matter is dictated by the fact that this argument is essentially a challenge to the jury instructions. See Tompkins v. Cyr, 202 F.3d 770, 784 (5th Cir. 2000). Since there was no objection at trial to the instructions on the grounds that the jury was instructed to award damages against each defendant, we review for plain error, which requires a showing that the challenged instruction was an obviously incorrect statement of law that was probably responsible for an incorrect verdict. See id.

The verdict form used by the district court instructed the jury to consider as elements of damages costs to Navigant related to the Thanksgiving Tower lease and the value of the Claims Practice. It asked a single question:

> What sum of money, if now paid in cash, would fairly and reasonably compensate Navigant for its damages, if any, that were proximately caused by the Defendant's breach of fiduciary duty?

The jury was instructed to answer for each person who had been found to have breached a fiduciary duty, and then provided with a space for Wilkinson and a separate space for Taulman. For both the jury answered "1,500,000."

Wilkinson and Taulman argue that these awards violate the "one satisfaction rule." This rule "applies to prevent a plaintiff from obtaining more than one recovery for the same injury." Sterling, 822 S.W2d at 7. "Appellate

36

courts have applied the one satisfaction rule when the defendants commit the same act as well as when defendants commit technically different acts which result in a single injury." Id. In addition, the one satisfaction rule prohibits recovery of the same damages under two different theories of recovery. Tompkins, 202 F.3d at 784.

Wilkinson and Taulman do not contend that Navigant was improperly permitted to recover the same damages under two different theories of recovery.[18] Nor can they argue that Navigant only suffered a single injury; as the verdict form itself indicated, Navigant sought damages relating to two separate injuries. Therefore, the instructions and verdict form were not obviously incorrect.

In addition, Wilkinson and Taulman cannot show that the instruction was responsible for an incorrect verdict. Wilkinson himself indicated that a conservative estimate for the value of the Claims Practice was $9–10 million, and estimated the liability on the Thanksgiving Tower lease at $1.35 million. In light of these values, we cannot say that a total award of $3 million to compensate Navigant for liability on the lease and for damages to the Claim Practice is incorrect.

## VII. CONCLUSION

The award of attorney's fees against Taulman is VACATED and REMANDED. In all other respects the judgment of the district court is AFFIRMED. Costs shall be borne by Wilkinson and Taulman.

---

[18] We note that the district court did eliminate the awards for misappropriation of trade secrets on the grounds that they represented an impermissible double recovery for damages that were also included in awards on the breach of fiduciary duty claim, namely, damages to Navigant's business that were caused by the disclosure of confidential information.