# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

—————

No. 17-50893

—————

In the Matter of: UTSA APARTMENTS 8, L.L.C.

Debtor

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2018

Lyle W. Cayce
Clerk

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

UTSA APARTMENTS, L.L.C.; WOODLARK UTSA APARTMENTS, L.L.C.,

Appellants

v.

UTSA APARTMENTS 8, L.L.C.; UTSA APARTMENTS 5, L.L.C.; UTSA
APARTMENTS 9, L.L.C.; UTSA APARTMENTS 12, L.L.C.; UTSA
APARTMENTS 13, L.L.C.; UTSA APARTMENTS 19, L.L.C.; UTSA
APARTMENTS 23, L.L.C.; UTSA APARTMENTS 24, L.L.C.; UTSA
APARTMENTS 25, L.L.C.; UTSA APARTMENTS 27, L.L.C.; UTSA
APARTMENTS 28, L.L.C.; UTSA APARTMENTS 30, L.L.C.; UTSA
APARTMENTS 34, L.L.C.; UTSA APARTMENTS 1, L.L.C.; UTSA
APARTMENTS 4, L.L.C.; UTSA APARTMENTS 6, L.L.C.; UTSA
APARTMENTS 15, L.L.C.; UTSA APARTMENTS 16, L.L.C.; UTSA
APARTMETS 18, L.L.C.,

Appellees

———————————

UTSA APARTMENTS, L.L.C.; WOODLARK UTSA APARTMENTS, L.L.C.,

Appellants

v.

UTSA APARTMENTS 8, L.L.C.; UTSA APARTMENTS 5, L.L.C.; UTSA
APARTMENTS 9, L.L.C.; UTSA APARTMENTS 12, L.L.C.; UTSA
APARTMENTS 13, L.L.C.; UTSA APARTMENTS 19, L.L.C.; UTSA
APARTMENTS 23, L.L.C.; UTSA APARTMENTS 24, L.L.C.; UTSA

No. 17-50893

APARTMENTS 25, L.L.C.; UTSA APARTMENTS 27, L.L.C.; UTSA
APARTMENTS 28, L.L.C.; UTSA APARTMENTS 30, L.L.C.; UTSA
APARTMENTS 34, L.L.C.,

      Appellees

———————————

UTSA APARTMENTS, L.L.C.; WOODLARK UTSA APARTMENTS, L.L.C.,

      Appellants

v.

UTSA APARTMENTS 8, L.L.C.; UTSA APARTMENTS 5, L.L.C.; UTSA
APARTMENTS 9, L.L.C.; UTSA APARTMENTS 12, L.L.C.; UTSA
APARTMENTS 13, L.L.C.; UTSA APARTMENTS 19, L.L.C.; UTSA
APARTMENTS 23, L.L.C.; UTSA APARTMENTS 24, L.L.C.; UTSA
APARTMENTS 25, L.L.C.; UTSA APARTMENTS 27, L.L.C.; UTSA
APARTMENTS 28, L.L.C.; UTSA APARTMENTS 30, L.L.C.; UTSA
APARTMENTS 34, L.L.C.,

      Appellees

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

Before HIGGINBOTHAM, PRADO, and HIGGINSON, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

      This is a consolidated appeal stemming from the bankruptcy of nineteen companies that were tenants-in-common of a student housing development in San Antonio, Texas, called The Reserve. Appellants are Woodlark UTSA Apartments, LLC ("Woodlark"), who was The Reserve's asset and property

No. 17-50893

manager, and a related entity, UTSA Apartments, LLC ("UTSA"),[1] which also owned an interest in The Reserve. This Court is asked to address the propriety of two rulings by the bankruptcy court concerning: (1) UTSA's share of net proceeds stemming from the sale of The Reserve to a third party during the bankruptcy proceedings, and (2) Woodlark's proof of claims against the bankruptcy estate. Appellants raise several issues involving the Bankruptcy Code and Texas fiduciary law. For the following reasons, we REVERSE the bankruptcy court's reduction of UTSA's share of net proceeds, but AFFIRM the bankruptcy court's reduction of Woodlark's proof of claims.

## I. BACKGROUND

### A.    The Parties

Appellees are nineteen Delaware limited liability companies ("Debtor TICs")[2] that—with Appellant UTSA and other limited liability companies that are not parties to this appeal ("Non-Debtor TICs")—owned undivided tenancy-in-common interests ("TICs") in The Reserve, an off-campus student housing project in San Antonio, Texas (the "Property"). Appellant Woodlark was the Property's asset manager. In addition, Woodlark was the Property's property manager, except for the period from February 2012 to April 2015.[3] Woodlark

---

[1] No party in this case is affiliated with the University of Texas at San Antonio.

[2] Specifically, the Debtor TICs are UTSA Apartments 1, LLC; UTSA Apartments 4, LLC; UTSA Apartments 5, LLC; UTSA Apartments 6, LLC; UTSA Apartments 8, LLC; UTSA Apartments 9, LLC; UTSA Apartments 12, LLC; UTSA Apartments 13, LLC; UTSA Apartments 15, LLC; UTSA Apartments 16, LLC; UTSA Apartments 18, LLC; UTSA Apartments 19, LLC; UTSA Apartments 23, LLC; UTSA Apartments 24, LLC; UTSA Apartments 25, LLC; UTSA Apartments 27, LLC; UTSA Apartments 28, LLC; UTSA Apartments 30, LLC; and UTSA Apartments 34, LLC. For the sake of simplicity, this opinion will utilize TIC1, TIC2, TIC3, . . . etc. corresponding to "UTSA Apartments #, LLC" to reference specific TICs.

[3] From February 2012 to April 2015, Woodlark designated International Realty Management, LLC ("IRM") to serve as Woodlark's sub-agent to "manage, operate, maintain and lease" the Property.

No. 17-50893

and UTSA are separate LLCs, but they are commonly owned by Harold Rosenblum through Woodlark Capital, LLC.

## B.    The Reserve Project and Governing Documents

In 2008, the TICs (the Debtor TICs, Non-Debtor TICs, and UTSA) purchased undivided tenancy-in-common interests in the Property for approximately $45 million. The Property was governed by three agreements: (1) the Declaration of Tenants in Common Agreement (the "Declaration"), (2) the Asset Management Agreement (the "AMA"), and (3) the Declaration of Call Agreement (the "Call Agreement"). While Woodlark, the Debtor TICs, and Non-Debtor TICs, signed and executed all three agreements, UTSA only signed and executed the Declaration and AMA. Despite being listed as a party to the Call Agreement, UTSA did not sign the Call Agreement.

In conjunction with the AMA, the Declaration made Woodlark, as asset manager, "the agent of the [TICs] with respect to overseeing and supervising the management, operation, maintenance and leasing of the Property, and for purposes of interfacing with the Lender." The Declaration also permitted Woodlark to "employ a Third Party Property Manager," as its agent "pursuant to the [AMA], to manage, operate, maintain and lease the Property."

Additionally, in the Declaration, each of the TICs agreed to be responsible for paying their pro rata share of "Property Expenses"[4] to be determined by Woodlark as asset manager. The Declaration provided a process for Woodlark to notify TICs that payment of pro rata expenses was due through payment requests, also known as cash calls. If payment was not made in response to a cash call as specified in the Declaration, "the other Tenants in

---

[4] These expenses included "Taxes, Debt Service, the Asset Management Fee, or other items specifically applicable to individual Tenants in Common or any future cash as may be needed in connection with the ownership, operation, management and maintenance of the Property."

Common and [Woodlark] [had] the right to purchase the Delinquent Tenant in Common's interest in the Property in accordance with the terms of the Call Agreement."

The Call Agreement governed the terms under which the Delinquent Tenant in Common's interest in the Property could be purchased through "Call Rights," which could "be exercised only by the Asset Manager [Woodlark]." Once exercised, however, the other TICs (the non-delinquent and non-dissenting TICs) had the option of purchasing a portion of the delinquent or dissenting TIC's interest "on a pro rata basis according to their Interests" after providing the required notice. Any interest of the defaulting or dissenting TIC not purchased by the other TICs could "be purchased by the Asset Manager [Woodlark]."

## C.    Turmoil at The Reserve

As both Appellants and Appellees concede, Woodlark and the TICs had a very contentious and adversarial relationship. After informing the TICs of the Property's deteriorating financial performance on December 3, 2014, Woodlark sent the first of three requests for funds, or cash calls, to the TICs on December 15, 2014, pursuant to the terms of the Declaration. Woodlark made a second cash call on February 4, 2015, and a third cash call on July 15, 2015. Only two of the TICs, UTSA and TIC11, responded to all three cash calls.

On September 22, 2015, Woodlark sent the TICs another request for funds within two business days pursuant to paragraph 4.2(b) of the Declaration. In this cash call, Woodlark sought payment for both the projected cash shortfall and delinquent funds. One week later, on September 29, 2015, Woodlark informed the non-paying TICs that their "failure to pay [their] corresponding pro-rata share of deficit in expenses" in response to the July and September cash calls had rendered them "Defaulting" TICs, also known as "Selling" TICs. Further, Woodlark stated that it was exercising its "Call

Rights" pursuant to the Call Agreement and that it intended to purchase the TICs' ownership interests in the Property. As prescribed by the Call Agreement, any non-defaulting TIC that also intended to purchase the Defaulting TICs' interests was given 30 days to notify Woodlark of its intention to purchase the Defaulting TICs' interests.

Only UTSA provided written notice of its intent to purchase the interests of the Defaulting TICs. On November 4, 2015, Woodlark notified the TICs that only UTSA had provided notice of intent to purchase the Defaulting TICs' interests and that UTSA had "opted to purchase the entire interests in default" (the "November 4th Letter"). Pursuant to the Call Agreement's provisions for determining the value of selling interests, Woodlark computed that the value of each of the Defaulting TICs' interests was "less than zero" with a deficiency owed to Woodlark. Furthermore, Woodlark stated that "[t]he fair market value of the Property . . . based on an appraisal performed a few days ago by a prospective capital partner" was $28.1 million (the "CBRE Appraisal"). Given this appraisal, the outstanding loan balance, the Property's payables balance, and the total amount of loans/advances provided by Woodlark, Woodlark maintained that no further payment was due to the Defaulting TICs for their ownership interests. Woodlark stated that the closing would take place on November 20, 2015. If the Selling TICs refused to execute the deed transferring ownership, Woodlark made clear that it would exercise the Call Agreement's "power of attorney" provision[5] to execute the deeds on their behalf, transferring ownership to UTSA.

---

[5] The Call Agreement granted Woodlark, as asset manager:

a special and limited power of attorney as the attorney-in-fact . . . for each Selling Tenant in Common, with power and authority to act in the name and on behalf of each such Selling Tenant in Common to (i) upon exercise of the Call Rights, vote the Interests of any Selling Tenant in Common in [Woodlark's] sole discretion until completion of the sale of the Interests of such

No. 17-50893

## D.     State Court Proceedings

On November 19, 2015, several resisting TICs[6] filed suit in the 150th Judicial District Court of Bexar County, Texas against Woodlark ("State Court Suit"). The TICs sued Woodlark for (1) breach of fiduciary duty, (2) negligence, and (3) breach of contract. Additionally, the TICs sought a temporary restraining order and permanent injunction prohibiting Woodlark from conveying the TICs' interests to itself via UTSA. The state court granted the TICs' request for a temporary restraining order precluding Woodlark from exercising its power of attorney.

In response to the State Court Suit, Woodlark filed a motion to compel arbitration, and Woodlark and UTSA jointly filed a demand for arbitration against all the TICs with the American Arbitration Association. Additionally, Woodlark and UTSA filed a separate petition to compel arbitration against several TICs[7] in the 288th Judicial District Court of Bexar County, Texas. Ultimately, seven[8] of the TICs either arbitrated their claims or settled with Woodlark and UTSA.

---

Selling Tenant in Common . . . , and (ii) execute, acknowledge and swear to the execution, acknowledgement and filing of documents . . . which may include . . . any contract for purchase, lease or sale of real estate, and any deed, deed of trust, mortgage or other instrument of conveyance or encumbrance, with respect to the Selling Tenant in Common's interests and/or the Property or any other instrument or document that may be required to effectuate the sale of the Property.

[6] Specifically, TIC5, TIC6, TIC8, TIC9, TIC12, TIC13, TIC19, TIC23, TIC24, TIC27, TIC28, and TIC34 filed suit. TIC4, TIC15, and TIC18 later intervened as plaintiffs.

[7] Specifically, TIC1, TIC2, TIC3, TIC5, TIC6, TIC7, TIC10, TIC14, TIC16, TIC17, TIC21, TIC22, TIC26, TIC29, TIC31, TIC32, and TIC33.

[8] The bankruptcy court's order lists eight TICs which settled, but the parties' briefs state that only seven TICs settled. Because the parties do not dispute this fact, this opinion references the number provided by the parties.

No. 17-50893

## E.     Bankruptcy Court Proceedings

### 1. Petitions for Bankruptcy

On December 2, 2015, fifteen[9] of the TICs filed voluntary petitions for Chapter 11 bankruptcy. Subsequently, four additional TICs joined. The now nineteen cases (corresponding to each of the Debtor TICs) were jointly administered before the United States Bankruptcy Court for the Western District of Texas under Case No. 15-52941. The same day, the Debtor TICs removed the State Court Suit, which included their contract, negligence, and breach of fiduciary duty claims against Woodlark, to the bankruptcy court, which was docketed as Adv. No. 15-5093 ("Breach of Duty Adversary").

### 2. Sale of The Reserve

During this time, the Debtor TICs began seeking a buyer for the Property. While several offers were secured for well above the $28.1 million valuation Woodlark asserted in the November 4th Letter,[10] both UTSA and Woodlark opposed the sale of the Property. After two unsuccessful attempts to sell the Property via motion, the Debtor TICs filed Adversary Proceeding No. 16-5047 ("Sale Adversary") seeking to sell the Property over Woodlark's objections pursuant to 11 U.S.C. § 363(h).[11] In the Sale Adversary, the Debtor TICs also objected to Woodlark's proofs of claim, specifically its claim for payment of cash advances, deferred management fees, and a disposition fee of approximately $1.485 million.

---

[9] In another unexplained discrepancy, the bankruptcy court's docket reflects 16 TICs that filed bankruptcy. However, the parties' briefs both state that only 15 TICs filed for bankruptcy. This opinion again refers to the number used by the parties.

[10] For instance, in May 2015, Vesper Acquisition, LLC offered to buy the Property for $33 million, and in April 2016, The Jacobson Company offered to buy the property for $32.5 million.

[11] As is discussed below, 11 U.S.C. § 363(h) permits a bankruptcy trustee to sell a co-owner's interest in property together with the estate's interest if certain conditions are met. See 11 U.S.C. § 363(h).

No. 17-50893

On September 14, 2016, following an agreement by the parties, the bankruptcy court issued an order authorizing the sale of the Property to Arris Reserve San Antonio, LLC ("Arris") for a sales price of $33.5 million and gross amount worth $35 million (the "Sale Order"). Under the Sale Order, all of the TICs' interests, including UTSA's interest, would be transferred to Arris, free and clear of all liens, claims, encumbrances, and interests. As to the sale's net proceeds, the Sale Order provided that they would be held by an escrow agent "pending final resolution of all the Claims against the Debtors' bankruptcy estates and payment of same and by further orders of the Court." Because the Debtor TICs' objections to Woodlark's proof of claims remained unresolved, they were severed and separately docketed as Adversary Proceeding No. 16-5070 ("Claims Adversary"). Finally, on November 21, 2016, the sale to Arris closed.

### 3. The Parties Seek Distribution of the Sales Proceeds

After the sale, the parties filed three separate motions for distribution of the sales proceeds. First, Woodlark filed a motion to distribute funds attributable to the Non-Debtor TICs,[12] which the bankruptcy court granted on December 16, 2016. Second, Woodlark and UTSA jointly filed a motion to distribute funds attributable to UTSA ("UTSA Motion to Distribute"), which the Debtor TICs opposed. Finally, the Debtor TICs filed a motion to surcharge Woodlark and UTSA "for the fees and costs that benefitted UTSA and Woodlark in connection with the sale of the [Debtor TICs'] assets" ("Debtor TIC Surcharge Motion"), which Woodlark and UTSA jointly opposed.

### 4. The Trial and Ruling

The bankruptcy court set the following matters for a consolidated bench trial to begin in January of 2017: (1) the Breach of Duty Adversary, (2) the

---

[12] This motion does not appear to have been opposed by the Debtor TICs.

No. 17-50893

Claims Adversary, (3) the UTSA Distribution Motion, and (4) the Debtor TIC Surcharge Motion. On January 23–26 and February 7, 2017, the bankruptcy court held a trial and considered testimony and evidence regarding these four matters.

After the trial, but prior to the bankruptcy court's ruling, the Debtor TICs, UTSA, and Woodlark agreed to move forward with a reorganization plan, which culminated in the bankruptcy court's confirmation order on February 23, 2017. The confirmation order, to which all parties consented, provided that the Debtor TICs' remaining claims would be determined the bankruptcy court, which retained jurisdiction pursuant to the reorganization plan.

On March 8, 2017, the bankruptcy court orally issued its findings of fact and conclusions of law regarding the four matters contested at trial. The court began with a basic factual chronology of the project, the TICs' purchase of the Property for $45 million, and the financial issues giving rise to the dispute between the TICs and Woodlark. The court found that by entering into the various agreements with the TICs "fiduciary duties were created and imposed upon Woodlark, because the investors, the TICs, were relying on Woodlark to manage the property and protect their investment." As a result of the financial crisis beginning in 2008, the court explained that the Property did not perform as well as had been anticipated, and Woodlark issued various cash calls to the TICs. The court noted that the relationship between Woodlark and the TICs was "adversarial" because the TICs "were very unhappy on many management issues." However, the court found that the TICs could not remove Woodlark as asset manager because one of the TICs was UTSA, a Woodlark affiliate, and Woodlark made it clear that UTSA would oppose any effort to remove Woodlark as asset manager. The court noted that the relationship between Woodlark and the TICs continued to deteriorate, with the TICs requesting audits that were never provided and the Property continuing to financially

decline. Ultimately, Woodlark, citing the CBRE Appraisal of the Property valuing it at $28.1 million, demanded that the TICs tender their ownership to Woodlark under the Call Agreement "for zero dollars." However, the court found that the CBRE Appraisal was flawed in two primary respects. First, the court found that the CBRE Appraisal omitted ad valorem tax refunds, stemming from tax litigation and protests which Woodlark had not kept up with despite its fiduciary duty to do so. Second, the court found that the CBRE Appraisal had not properly taken into account the value of vacant land that was part of the Property. Had the CBRE Appraisal taken into account these two items, the court found that the Property would have been worth at least $33 million, a valuation that was ultimately "proven" by the actual $33.5 million sales price.

Turning to the instant bankruptcy litigation, the court observed that the Debtor TICs had been attempting to market and sell the Property over the course of the case with "Woodlark . . . resisting and objecting every step of the way." With the sale completed without "very much help from Woodlark," the court summarized the parties' opposing positions with respect to the approximately $2.1 million net sale proceeds. On the one hand, Woodlark sought the entire $2.1 million, which included all of its cash advances to the Property, all unpaid management fees, and a 4.5% transaction fee stemming from the sale of the Property. On the other hand, the Debtor TICs claimed that Woodlark should receive nothing and that they should receive the full $2.1 million as a result of their breach of contract and breach of fiduciary duty claims, which should bar Woodlark's recovery of cash advances, management fees, and transaction fees. In addition, the court noted the Debtor TICs' request for actual and punitive damages.

The court announced that it would allow Woodlark to recover its actual cash advances to the Property and the Debtor TICs, but it would disallow the

property management fees, asset management fees, and transaction fee. The court held that Woodlark "and its affiliated entity" UTSA would not be given credit for the 19% ownership interest that was transferred to UTSA under Woodlark's demand. Instead, the court stated that the 19% would be shared pro rata among the remaining TIC owners. Thus, the court held that, following the reimbursement of Woodlark's cash advances, UTSA's share of the net proceeds would be 3.14%, and the Debtor TICs' share would be 96.86%.

As to the Debtor TICs' breach of contract and breach of fiduciary duty claims, the court began by describing the duties of a fiduciary and noted that the "burden of proof is on the fiduciary to show fairness of the transaction." The court opined that "Woodlark treated the relationship as a typical contractual agreement in which both parties look out for their own financial interests first, [but that] this was not such a contract." The court found that Woodlark used the CBRE Appraisal "as a cudgel to force the TICs to pay up or forfeit their interests." Quoting Justice Cardozo's seminal opinion in *Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928), the court held that Woodlark's actions violated its fiduciary duties to the TICs requiring "the punctilio of an honor the most sensitive" and holding Woodlark to "something stricter than the morals of the marketplace." Accordingly, in light of Woodlark's breach of the contract and breach of fiduciary duties, the court held that Woodlark must forfeit the unpaid asset management fees, unpaid property management fees, and the 4.5% transaction fee.

As to Woodlark's proof of claims, the court granted Woodlark's actual cash advances, totaling $410,097.78, and disallowed the remainder of its claims. The court stated that remaining net proceeds would be divided by UTSA and the Debtor TICs, with UTSA receiving 3.14%—its share having been reduced from 21.17%—and the Debtor TICs receiving 96.86%. The court declined to grant any further damages, attorneys' fees, or surcharges, and

denied all other relief. Upon further questioning by Woodlark and UTSA's counsel, the court gave two reasons for reducing UTSA's share to 3.14%. First, the court explained that UTSA did not sign the Call Agreement. Second, the court explained that it did not believe that "they[13] should profit from this action, which I felt like was a breach of fiduciary duty, to try to force the TICs to surrender their interest for no consideration when the property was worth more."

Following the trial, the court entered final judgment in the bankruptcy case disallowing all of Woodlark's claims against the Debtor TICs and the bankruptcy estate, except for $410,097.78 representing "cash advances made by [Woodlark] pre-petition." The judgment also provided that the Debtor TICs would be awarded a distribution of 96.86% of the net remaining amount of the estate and UTSA would be awarded a distribution of 3.14% of the net remaining amount. Additionally, consistent with its oral rulings, the court entered an order granting in part and denying in part the UTSA Distribution Motion, and it entered an order denying the Debtor TIC Surcharge Motion.

## F.     District Court Appeal

In March 2017, UTSA and Woodlark filed notices of appeal of the bankruptcy court's final judgments and order distributing funds. While the three appeals were docketed as separate matters in the United States District Court for the Western District of Texas, the cases were consolidated under cause number SA-17-CV-285-FB. On October 4, 2017, after the parties filed briefs, the district court issued an order affirming the bankruptcy court. The district court's order briefly recited the facts of the case and summarily affirmed the bankruptcy court's reasoning and rulings, stating that it had

---

[13] It is unclear whether the bankruptcy court's use of "they" refers to Woodlark, UTSA, or both. At various points, the court's oral ruling characterizes UTSA as an "affiliate[]" or "affiliated entity" of Woodlark.

13

No. 17-50893

"conducted a de novo review of the legal conclusions at issue in this case" and applied "the clearly erroneous standard to the factual findings." Specifically, the district court affirmed the bankruptcy court's reduction of the share of net proceeds payable to UTSA from 21.17% to 3.14% and the reduction of Woodlark's aggregate proofs of claim from $510,475.89 to $410,0997.78. After affirming the bankruptcy court in full, the district court closed all three matters and entered final judgment.

## G.    Instant Appeal

On October 5, 2017, Woodlark and UTSA (collectively, "Appellants") jointly filed a notice of appeal from the district court's judgment affirming the bankruptcy court. Appellants moved for a stay of the district court's judgment pending its appeal to this Court. This Court granted a stay and expedited the appeal to the next available calendar.

## II. JURISDICTION & STANDARD OF REVIEW

## A.    Jurisdiction

This Court has appellate jurisdiction to review final district court orders considering appeals from final judgments, orders, and decrees entered by the bankruptcy court. *See* 28 U.S.C. §§ 158(a) & (d). Here, Appellants appeal from a district court's order and judgment affirming two final judgments and an order distributing funds entered by the bankruptcy court. Thus, we have jurisdiction over this bankruptcy appeal.

## B.    Standard of Review

"We review a district court's affirmance of a bankruptcy court decision by applying the same standard of review to the bankruptcy court decision that the district court applied." *In re Martinez*, 564 F.3d 719, 725–26 (5th Cir. 2009). As a general rule, "a bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*." *In re Heritage Consol., L.L.C.*, 765 F.3d 507, 510 (5th Cir. 2014) (citation omitted). A bankruptcy

court's factual finding is "clearly erroneous only if 'on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed.'" *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (quoting *Hibernia Nat'l Bank v. Perez*, 954 F.2d 1026, 1027 (5th Cir. 1992)). The clearly erroneous standard of review "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985); *see also Matter of Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993). In reviewing factual findings, this Court "must give 'due regard . . . to the opportunity of the [bankruptcy] court to judge the credibility of the witnesses.'" *Hibernia*, 954 F.2d at 1027 (quoting Fed. R. Civ. P. 52(a)) (alteration in original).

## III. DISCUSSION

Appellants challenge two rulings by the bankruptcy court: (1) the reduction of UTSA's share of net proceeds from 21.17% to 3.14%, and (2) the reduction of Woodlark's proof of claims from $510,475,98 to $410,097.78. We address each ruling in turn.

## A.    Reduction of UTSA's Share of Net Proceeds

Appellants assert that the bankruptcy court erred in reducing the share of net proceeds payable to UTSA from 21.17% to 3.14%. The bankruptcy court gave two reasons for this reduction: (1) UTSA did not sign the Call Agreement, and (2) UTSA, and by association Woodlark, should not profit from Woodlark's breach of fiduciary duty in attempting to force the TICs to surrender their interest for no consideration when the Property was worth more than Woodlark maintained.

### 1. Whether Reduction Violates Bankruptcy Code

Appellants first argue that the bankruptcy court's reduction of UTSA's share of net proceeds payable from the sale of the Property violates the plain

language of the Bankruptcy Code[14] (the "Code") relating to such sales. Both Appellants and Appellees agree that the sale of the Property was made pursuant to the Code's mechanism for the sale of co-owned bankruptcy estate property under 11 U.S.C. § 363(h). In pertinent part, § 363(h) provides:

> [T]he trustee may sell both the estate's interest . . . and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--
>> (1) partition in kind of such property among the estate and such co-owners is impracticable;
>> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h). This sales provision was intended to address "the complex problem that arises when fewer than all of the co-owners of property are debtors in bankruptcy." *In re Sturman*, 222 B.R. 694, 707 (Bankr. S.D.N.Y. 1998). After a sale under § 363(h), the Bankruptcy Code provides that "the trustee shall distribute to . . . the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses . . . of such sale, according to the interests of such . . . co-owners, and of the estate." 11 U.S.C. § 363(j).

Appellants assert that because UTSA undisputedly held a 21.17% interest in the Property at the time of the distribution,[15] the bankruptcy court

---

[14] The Bankruptcy Code is codified in Title 11 of the United States Code. *See* 11 U.S.C. § 101 *et seq.*

[15] Appellees do not contest UTSA's 21.17% interest share. However, they argue that for equitable reasons discussed below, this share is subject to a constructive trust.

was required under § 363(j) to distribute 21.17% of the net proceeds of the sale to UTSA. Appellees argue that the bankruptcy court correctly applied § 363(j) because the relevant time for determining the interest of co-owners is "at the time of the commencement of the case"—here, December 2, 2015.  Appellees assert that UTSA acquired the additional interest bringing its share to 21.17% after December 2, 2015, and therefore the bankruptcy court did not err in only awarding UTSA a 3.14% share.

This issue is difficult for two reasons. First, § 363(j) itself is silent as to how the trustee or court is to ascertain the interests of co-owners and of the estate. *See* 11 U.S.C. § 363(j). Second, no court has specifically addressed whether § 363(j) requires distribution of proceeds in accordance with the interest share at the time of distribution or the interest share at the time of the commencement of the case. While a few courts have suggested that courts are to look to the petition date to determine the nature of the co-ownership interest under § 363(h),[16] none has suggested that the interest shares themselves are defined and fixed as of the petition date for purposes of distribution under § 363(j).

In support of their position, Appellees only point to *Aino v. Maruko, Inc. (In re Maruko, Inc.)*, 200 B.R. 876 (Bankr. S.D. Cal. 1996). In that case, the debtor argued that it should not have to pay the proceeds from the § 363(h) sale of its properties when various co-owners might ultimately not be entitled to any proceeds as the result of "cancellation claims," which if successful would deny them co-owner status. *Id.* at 880. Reasoning that § 363(j) was linked to

---

[16] *See, e.g.*, *In re Ball*, 362 B.R. 711, 719–20 (Bankr. N.D.W. Va. 2007); *Stine v. Diamond (In re Flynn)*, 297 B.R. 599, 606 (B.A.P. 9th Cir. 2003), *rev'd* 418 F.3d 1005 (9th Cir. 2005) (reversing on the grounds of whether distribution should be immediate or stayed); *Dahar v. Jackson (In re Jackson)*, No. 01-13153-JMD, ADV. 02-1085-JMD, 2003 WL 21991629, at *7–8 (Bankr. D. N.H. Aug. 6, 2003*); In re Ginn*, 186 B.R. 898, 902–03 (Bankr. D. Md. 1995).

§ 363(h), which looked to "*the time of the commencement of the case*," *id.* at 882 (quoting 11 U.S.C. § 363(h)), the bankruptcy court stated that "[t]he date for measuring co-ownership is the petition date." *Id.*

However, upon closer inspection, the *Maruko* court did not seek to determine the ownership share of various co-owners. Instead, the court sought to determine whether the parties, who were co-owners at the commencement of the case and at the time of the sale but who might not be co-owners in the future (as a result of pending "cancellation claims"), should receive their share of the proceeds immediately pursuant to § 363(j). *See id.* at 881–83. In that particular context, the court looked to the date of the commencement of the case to determine "their *status* as co-owners," despite "contemplated future events" (*i.e.* the unresolved "cancellation claims"). *Id.* at 883 (emphasis added). Thus, despite Appellees urging otherwise, *Maruko* does not stand for the proposition that courts must distribute sales proceeds according to interest shares as of the commencement date in the face of otherwise valid property transfers to other co-owners after the commencement of the case. As in *Maruko*, the other cases commenting on § 363(j) focus on determining the *nature* of the co-owners' interest shares rather than the percentage of ownership attributable to each co-owner. *See In re Ball*, 362 B.R. at 717–20 (determining whether debtor's wife was a co-owner at the time of the bankruptcy petition despite potential fraudulent transfer claims undermining that ownership interest); *In re Ginn*, 186 B.R. at 902–03 (determining how to divide a tenancy by the entirety between spouses pursuant to § 363(j)).

While no case law supports the notion that ownership interest shares themselves are determined as of the date of the petition, general principles of bankruptcy law support giving effect to otherwise valid, legally binding transfers of ownership from various TICs to UTSA under Texas law. As the Supreme Court has stated, "[p]roperty interests are created and defined by

state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). In fact, § 363(h) does not "purport to alter or redefine the property rights upon which it was designed to operate." *In re Persky*, 134 B.R. 81, 85 (Bankr. E.D.N.Y. 1991). Thus, under § 363(h), "[s]tate and not federal law determines the nature and extent of a debtor's interest in property as of the date of the commencement of his bankruptcy case under all of the authorities." *Lake Erie Leasing, Inc. v. Bundy (Matter of Bundy)*, 53 B.R. 582, 584 (Bankr. W.D. Pa. 1985); *see also In re Persky*, 134 B.R. at 85.

Given this backdrop, it naturally follows that state law should similarly determine the interest shares for purposes of a § 363(j) distribution following a sale pursuant to § 363(h). This comports with the bankruptcy law principle that "property interests and estates are to be dealt with in the bankruptcy courts in such a manner as to give full respect to the rules of property followed in the state where the property is located." *In re Persky*, 134 B.R. at 85 (quoting *Reid v. Richardson*, 304 F.2d 351, 353 (4th Cir. 1962)). Here, it is undisputed that the bankruptcy court properly ordered a sale of the Property pursuant to § 363(h) because all the owners of the Property were co-owners at the commencement of the bankruptcy case. Furthermore, it is uncontested that UTSA legally possessed a 21.17% ownership share in the Property under Texas law prior to its sale to Arris. Thus, in light of the general principles discussed above and applying the plain terms of § 363(j), we find that UTSA was entitled to receive a 21.17% interest of the net proceeds of the sale and that the bankruptcy court's allocation of only 3.14% to UTSA violates the Bankruptcy Code.

However, the inquiry regarding the propriety of the reduction of UTSA's share of net proceeds to 3.14% does not end there because Appellees argue that

the reduction of UTSA's share was justified on equitable grounds. Accordingly, we next consider whether the bankruptcy court was otherwise justified in making the reduction despite its apparent conflict with the mandate of § 363(j).

### 2. Equitable Justification for Reducing UTSA's Share

Appellants argue that the bankruptcy court's equitable justification for reducing UTSA's share of the net proceeds was flawed because UTSA was never sued for breach of fiduciary duty nor was found to be a fiduciary of the other TICs. Thus, according to Appellants, the bankruptcy court's equitable remedy of reducing UTSA's share on the basis of Woodlark's breach of fiduciary duty could only have been based on the bankruptcy court's inherent equitable powers, which must be exercised in conformity with the Bankruptcy Code. Because, as discussed above, the reduction violated § 363(j)'s distribution mandate, Appellants assert that the bankruptcy court erred in reducing UTSA's share in this exercise of equitable power.

On the other hand, Appellees argue the bankruptcy court was not exercising its inherent equitable powers, but rather imposing the well-established equitable remedy of a constructive trust pursuant to Texas law. They argue that a fiduciary who benefits himself over his principal must "account for, and yield to the principal, any profit that he *or such third party* makes as a result of such breach of fiduciary duty." Under Appellees' theory, because UTSA improperly acquired interest shares from other TICs as a result of Woodlark's breach of fiduciary duties, the bankruptcy court was justified in reducing UTSA's share of the net sales proceeds—despite UTSA being a separate legal entity from Woodlark and a non-party to the breach of fiduciary duty action.

### a.    Texas constructive trusts

Under Texas law, "[a] constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Baker Botts, L.L.P. v. Cailloux*,

224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied); *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App.—Texarkana 2013, pet. denied) ("A constructive trust is a remedy—not a cause of action."). The breach of a fiduciary relationship can justify the imposition of a constructive trust. *See Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974); *see also Young v. Fawcett*, 376 S.W.3d 209, 216 (Tex. App.—Beaumont 2012, no pet.); *Baker Botts*, 224 S.W.3d at 736. "To obtain a constructive trust, the proponent must prove (1) the breach of a special trust, fiduciary relationship, or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Gray v. Sangrey*, 428 S.W.3d 311, 315 (Tex. App.—Texarkana 2014, pet. denied); *see also Matter of Haber Oil Co.*, 12 F.3d 426, 437 (5th Cir. 1994) (reciting same elements).

Whether to ultimately impose a constructive trust "must be determined by a court based on the equity of the circumstances." *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). "The scope and application of equitable relief such as a constructive trust within some limitations, is generally left to the discretion of the court imposing it." *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 874 (Tex. 2017) (internal quotation marks and citation omitted). However, "[b]ecause the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant 'to impose constructive trusts without a substantial reason to do so.'" *Haber Oil*, 12 F.3d at 436 (citation omitted).

### *b.* **Haber Oil**

While arising out of different facts from the present case, this Court's decision in *Haber Oil* is nonetheless instructive here. In that case, petroleum geologist David Swinehart entered into a series of contracts with Haber Oil whereby he would locate and evaluate oil and gas drilling prospects in exchange for a monthly retainer and a percentage of the working interest in

prospects and wells. *Id.* at 431. After a dispute arose between Swinehart and Haber Oil, Swinehart filed suit in state court seeking, "among other things, a constructive trust to be imposed on certain properties based on a breach of a confidential relationship between Swinehart and Haber Oil." *Id.* While the state court litigation was pending, Haber Oil filed for Chapter 11 bankruptcy. *Id.* at 432. After Haber Oil filed for bankruptcy, Swinehart filed an unsecured proof of claim seeking damages in bankruptcy court and attached his state court pleadings. *Id.* Thereafter, Haber Oil's debtors proposed a plan of reorganization, which Swinehart objected to on the basis that it would discharge his pending state claim without adjudication. *Id.* After the bankruptcy court approved the plan, which involved an unrelated entity receiving a security interest in all property in the Haber Oil estate, Swinehart filed a trial memorandum in support of his claim requesting that the court impose a constructive trust on the disputed properties and award him his ownership interests in the properties or their fair market value. *Id.* at 432–33. Eventually, the bankruptcy court ruled on Swinehart's claim holding that Swinehart owned a percentage interest in certain affected properties. *Id.* at 433. However, because the properties had already been sold, the court ordered Haber Oil to pay Swinehart cash reflecting the present value of the properties. *Id.* Haber Oil filed motions seeking reconsideration, vacatur or modification of the award, and a new trial on the basis the litigation leading up to the award "had not been a full-fledged adversary proceeding as required by the bankruptcy rules, but rather a mere contested matter." *Id.* at 434. The bankruptcy court denied Haber Oil's motions and dismissed a related adversary proceeding that Haber Oil filed seeking to void Swinehart's unrecorded property interests. *Id.* On appeal, Haber Oil challenged the bankruptcy court's imposition of a constructive trust asserting that it was

22

made "on a record devoid of the pleadings, proof, and findings of fraud that are part and parcel of the constructive trust remedy." *Id.* at 435.

The *Haber Oil* court began its analysis by "reviewing the interface between federal bankruptcy law and state laws providing for the imposition of a constructive trust." *Id.* The court described the imposition of a constructive trust as "potent" and noted that "[b]ecause the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant 'to impose constructive trusts without a substantial reason to do so.'" *Id.* at 436 (quoting *Neochem Corp. v. Behring Int'l, Inc. (In re Behring Int'l, Inc.)*, 61 B.R. 896, 902 (Bankr. N.D. Tex. 1986)). Turning to the facts before it, the court considered the pleadings filed in bankruptcy court to determine whether the imposition of a constructive trust in favor of Swinehart was warranted. *Id.* at 436–37. The court found that Swinehart's sporadic invocations of a constructive trust during the bankruptcy proceedings did not comply with the bankruptcy rules governing adversary proceedings. *Id.* at 439–40.

Additionally, the court considered Swinehart's argument that Haber Oil waived its right to an adversary proceeding on constructive trust because "for all substantive purposes, an adversary proceeding was held" and all issues were "fully ventilated." *Id.* at 440. The court rejected this argument, noting that "courts should not find waiver of the procedural protections required in adversary proceedings unless the parties are apprised of and have a chance to address all the issues being decided." *Id.* (citing *Tr. Corp. of Mont. v. Patterson (In re Copper King Inn, Inc.)*, 918 F.2d 1404, 1407 (9th Cir. 1990)). Reasoning that "Haber Oil was not given proper notice prior to the commencement of the post-confirmation proceedings in the bankruptcy court that it was being called upon to defend claims of fraud," the court held that "the bankruptcy court erred by reaching and ruling on Swinehart's claim seeking imposition of a

constructive trust." *Id.* The court went on to consider the proof offered in support of a trust and the bankruptcy court's findings, specifically Swinehart's failure to identify misrepresentations supporting fraud and the bankruptcy court's failure to specify the identifiable property that could be traced back to the original res acquired by fraud. *Id.* at 440–42. Reversing the bankruptcy court's decision to impose a constructive trust, the court held that "[t]he requirements of pleadings, proof, and findings must be strictly enforced against constructive trust claimants to protect the integrity of the bankruptcy system." *Id.* at 443.

### c.    *The court's imposition of a constructive trust*

Here, even assuming that Woodlark breached its fiduciary relationship with the TICs, the bankruptcy court's imposition of a constructive trust on UTSA's share of net proceeds appears even more problematic than the constructive trust we rejected in *Haber Oil*. First, akin to the situation faced by Haber Oil, the Debtor TICs never filed an adversary proceeding against UTSA for breach of fiduciary duty or sought a constructive trust. Woodlark was the only defendant named in the Breach of Duty Adversary and in the State Court Suit. Furthermore, unlike Haber Oil—which was at least aware of the potential imposition of a constructive trust through various filings—the Debtor TICs never explicitly sought the imposition of a constructive trust against UTSA in their state court petition, notice of removal to bankruptcy court, or final amended complaint in bankruptcy court. The only equitable relief sought in the Debtor TIC's final amended complaint was a request for a permanent injunction and forfeiture of Woodlark's management fees. Similarly, the bankruptcy court's joint pre-trial order does not name UTSA as a defendant or mention the imposition of a constructive trust. The bankruptcy court's summary of the Debtor TICs' claims describes the adversary proceeding as one "seek[ing] damages and injunctive relief by reason of Woodlark's

mismanagement of the Property." Finally, while Appellees belatedly claim in their brief that UTSA "knowingly and willingly" participated in Woodlark's breach of fiduciary duties, those allegations regarding UTSA are critically absent from any of the Appellees' pleadings.

Appellees raise similar waiver arguments as those we considered and rejected in *Haber Oil*. They argue that UTSA consented to the bankruptcy's distribution of the sale's proceeds and that because all the issues were tried together and with the same attorneys, "UTSA cannot now be heard to complain that it did not participate in that Trial, which was conducted under the adversary rules." However, as *Haber Oil* makes clear, "courts should not find waiver of the procedural protections required in adversary proceedings unless the parties are apprised of and have a chance to address all the issues being decided." 12 F.3d at 440 (citing *In re Copper King Inn*, 918 F.2d at 1407). Here, the conditions for such waiver are not present: UTSA was never named as a defendant in the Breach of Duty Adversary, was never apprised of the Debtor TICs' intention to seek a constructive trust, and was never given an opportunity to rebut or present any defenses to the imposition of a constructive trust.

Finally, as previously discussed, the imposition of a constructive trust on the sale's proceeds resulting in UTSA's share being reduced violates the mandate of § 363(j) requiring distribution in accordance with the co-owners' interest. As *Haber Oil* warns, "[e]ven the broad powers of bankruptcy courts to fashion equitable remedies . . . must be exercised only within the confines of the Bankruptcy Code." 12 F.3d at 442–43 (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). Given the serious procedural deficiencies identified above, the lack of notice to UTSA regarding the imposition of a constructive trust, and the remedy's violation of the terms of the Code, we

REVERSE the bankruptcy court's decision to reduce UTSA's share of net proceeds.[17]

## B.    Reduction of Woodlark's Proof of Claims

In ruling on Woodlark's Breach of Duty Adversary, the bankruptcy court found that Woodlark breached its fiduciary duties to the TICs. In light of this breach, the court held that Woodlark would forfeit the unpaid asset management fees, unpaid property management fees, and the 4.5% transaction fee. Thus, the court granted Woodlark's proof of claims representing actual cash advances totaling $410,097.78, and disallowed the remainder of its claims. Woodlark challenges this decision on appeal, asserting that it is entitled to the full amount of its proof of claims totaling $510,475.89. Woodlark argues that the bankruptcy court's decision based on the breach of fiduciary duty claim was flawed because "it improperly based the burden of proof on Woodlark, it relied on non-existent appraisal testimony and it failed to find either harm to the Plaintiffs or benefit to the Defendant as required by Texas law." We examine each argument below.

### 1. Burden of Proof for Breach of Fiduciary Duty

Woodlark argues that the bankruptcy court erroneously shifted the burden of proof to Woodlark by applying a presumption of unfairness. As the parties agree, the elements of a breach of fiduciary duty claim under Texas law are: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the

---

[17] Appellants also identify various other grounds for reversing the bankruptcy court's reduction of UTSA's share of net proceeds. However, because the issues discussed above are the heart of the dispute between the parties on appeal and dispositive on the propriety of the bankruptcy court's ruling regarding UTSA, we need not reach the other issues raised as to the reduction of UTSA's share of net proceeds. *See Stokes v. Atl. Sounding Co., Inc.*, 548 F. App'x 156, 159 (5th Cir. 2013).

defendant." *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *see also Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (reciting the same elements).

"Under Texas law, where a fiduciary engages in a transaction with a party to whom the fiduciary owes duties, a presumption of unfairness arises, and the burden is placed on the fiduciary to establish that the transaction was fair." *Navigant*, 508 F.3d at 295; *see also Lee v. Hasson*, 286 S.W.3d 1, 21 (Tex. App.—Houston [14th Dist] 2007, pet. denied). Once the presumption is established, the fiduciary must prove that it "acted in good faith and that the transactions were fair, honest, and equitable." *Lee*, 286 S.W.3d at 21. "In establishing the fairness of a transaction involving a fiduciary, some of the most important factors are: (1) whether there was full disclosure regarding the transaction, (2) whether the consideration (if any) was adequate, and (3) whether the beneficiary had the benefit of independent advice." *Estate of Townes v. Townes*, 867 S.W.2d 414, 417 (Tex. App.—Houston [14th Dist.] 1993, writ denied).

Woodlark asserts that the presumption of unfairness should not have been applied in this case because the Debtor TICs never transferred their interests in the Property to Woodlark, thus there were no transactions to which a presumption of unfairness could attach. As Woodlark argues, "[b]ecause there was never a consummated transaction between Woodlark and the Debtor TICs, the presumption of unfairness did not arise and the Bankruptcy Court erred in placing the burden upon Woodlark to prove the fairness of the transaction." While the Debtor TICs agree with Woodlark as to the general contours of the presumption of unfairness, they argue that they did not have to capitulate to Woodlark's wrongful conduct by transferring their interests for the presumption of unfairness to arise. They contend that the presumption of unfairness can also arise when, "as in the present case, the fiduciary places

No. 17-50893

itself in a position in which its self-interest, or the self-interest of some third party identified with the fiduciary (UTSA), might conflict with its obligations as a fiduciary."

This Court has held that a transaction between the fiduciary and principal is required for the presumption of unfairness to apply. *See Navigant*, 508 F.3d at 295; *Amwest Sav. Ass'n v. Statewide Capital, Inc.*, 144 F.3d 885, 891 (5th Cir. 1998). In *Navigant*, we stated that "where there is no transaction between the fiduciary and principal, there is no presumption of unfairness, and the burden of proof does not shift to the fiduciary." 508 F.3d at 295. Similarly in *Amwest*, this Court required a transaction between a fiduciary and principal before applying the presumption of unfairness and rejected the notion that "anytime a fiduciary is accused of wrongdoing he or she bears the burden of proving otherwise." 144 F.3d at 891. However, we also suggested in *Navigant* that transactions giving rise to a presumption of unfairness can take a variety of traditional and non-traditional forms. *See Navigant*, 508 F.3d at 296. While "[p]aradigmatic cases might be said to include, in addition to the partner who purchases his co-partner's interest, the attorney who takes a deed from his client, or the agent who obtains a gift from his principal," the presumption can also arise "in situations where a transaction between the fiduciary and the one to whom duties are owed is less readily identifiable." *Id.* As we noted, especially in the context of self-dealing transactions where a fiduciary derives personal profit through dealings with the principal or its property, "the form of the transaction will give way to the substance of what actually has been brought about." *Id.* (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)).

In the instant case, the Debtor TICs alleged that Woodlark breached its fiduciary duties to the TICs by: (1) "making demands for contributions of funds and threatening to transfer Plaintiffs' tenancy in common interests to itself

while refusing to allow the audit expressly authorized by the [AMA];" (2) "making demand for contributions for funds at a time the available funds from the property tax refunds was more than the amount of the alleged shortfall;" (3) "making demand of Plaintiffs that they transfer their TIC interest to Defendant for an amount that was less than the fair market value of the Reserve;" (4) "using the CBRE appraisal to fix the fair market value of the Reserve even though such use was expressly forbidden by the appraisal;" and (5) "supplying CBRE with faulty financial data resulting in an understatement of the appraised value of the Reserve." As summarized by the bankruptcy court, "Woodlark used the appraisal as a cudgel to force the TICs to pay up or forfeit their interests." In this context, while not involving a traditional transaction between the Debtor TICs and Woodlark, these allegations of self-dealing and threats by Woodlark relating to the attempted acquisition of the Debtor TICs interests (and the actual acquisition of other capitulating TICs interests) in substance supports the imposition of a presumption of unfairness on Woodlark as fiduciary. *See Navigant*, 508 F.3d at 296. This required Woodlark to prove that it "acted in good faith" and that its dealings with the Debtor TICs were "fair, honest, and equitable." *See Lee*, 286 S.W.3d at 21. Accordingly, we find that the bankruptcy court properly applied the presumption of unfairness in this case.

### 2. Factual Findings

Woodlark also challenges two factual findings made by the bankruptcy court with respect to the Debtor TICs' breach of fiduciary duty claim. First, Woodlark challenges the bankruptcy court's determination that Woodlark's cash calls were unnecessary. Second, Woodlark challenges the bankruptcy court's determination that the CBRE Appraisal was flawed. In response, Appellees assert that sufficient evidence in the record supported the bankruptcy court's findings on both issues.

As stated above, this Court reviews a bankruptcy court's findings of fact for clear error. *See Heritage*, 765 F.3d at 510. Such a finding "is clearly erroneous only if 'on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed.'" *Dennis*, 330 F.3d at 701 (quoting *Hibernia*, 954 F.2d at 1027). In considering both findings challenged by Woodlark, we find that neither was clearly erroneous because ample evidence supported the bankruptcy court's findings, and one is not left with a definite and firm conviction that a mistake was made.

### a.     *Unnecessary cash calls*

The bankruptcy court found that "when [Woodlark] issued these cash calls, it wasn't really necessary to issue [them] because there was [$]120,000 for one year and [$]130,000 for another year that the property was entitled to in refunds from the local taxing authorities." At trial, the Debtor TICs provided evidence that Woodlark had not kept up with ad valorem tax litigation, and that ultimately an individual TIC pursued and obtained the tax refunds through a mediation settlement agreement. These refunds were not insignificant—a $138,842.55 refund for 2013, and a $121,705.73 refund for 2014.

In its reply brief to the district court, Woodlark conceded that had these tax refunds been received earlier, the first cash call "would not have been necessary" and the second cash call "would have been reduced" by over $200,000. In light of this clear concession below that the first cash call would have been unnecessary had the Property received the tax refunds, we hold that the bankruptcy court did not err when in making its factual determination on the cash calls because one is not left with the firm conviction that a mistake has been committed. *See Dennis*, 330 F.3d at 701.

No. 17-50893

### b.    *Flawed appraisal*

The bankruptcy court also found that the CBRE Appraisal valuing the Property at $28.1 million was flawed because (1) it omitted the ad valorem tax refunds, and (2) it did not take into account the value of vacant land on the property. Had the CBRE Appraisal taken into account these two items, the bankruptcy court found that the Property would have been worth at least $33 million, a valuation that was ultimately "proven" by Arris's 2016 purchase of the Property for a sales price of $33.5 million. Woodlark asserts that this determination was erroneous because it was speculative and not supported by competent expert testimony.

Despite Woodlark's assertions, it fails to cite any case law supporting the view that expert testimony is required to undermine an appraisal's valuation or establish the fair market value of a property. Furthermore, as Appellants persuasively argue, the purpose of the bankruptcy court's determination on this point was not to establish the fair market value of the Property, but rather to contribute to the evidence that Woodlark breached its fiduciary duties by using a flawed appraisal to force the TICs to transfer their interests to Woodlark. Furthermore, both reasons for the bankruptcy court's finding were supported by evidence offered at trial. Evidence in the record indicates that the CBRE Appraisal did not include the ad valorem tax refunds that the Property later received. Additionally, there is evidence in the record indicating that the CBRE Appraisal did not account for the value of undeveloped land that was part of the Property. Finally, the record indicates that multiple offers for the Property were made in excess of the $28.1 million CBRE valuation, which the bankruptcy court found was ultimately proven by the sale to Arris for $33.5 million. In light of the evidence supporting the bankruptcy court's determination that the CBRE Appraisal was flawed, we find that the

bankruptcy court did not err because one is not left with the firm conviction that a mistake has been committed. *See Dennis*, 330 F.3d at 701.

### 3. *Failure to Find Harm or Benefit*

Finally, Woodlark challenges the bankruptcy court's reduction of its proof of claims on the basis that there was no evidence supporting the third element of a breach of a fiduciary duty claim, *i.e.*, that Woodlark's breach resulted in injury to the Debtor TICs or benefit to Woodlark. In response, the Debtor TICs do not contest Woodlark's assertion, but instead argue that they "did not have to prove causation and actual damages . . . because they sought and obtained equitable relief for *inter alia* Woodlark's self-dealing and conflict of interest, as well as for Woodlark's failure to make full disclosure."

As stated above, the third element of a breach of a fiduciary duty claims is "the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Jones*, 196 S.W.3d at 447. However, as Appellees correctly note, under Texas fiduciary law governing agency, a plaintiff need not prove causation and actual damages when seeking equitable relief such as fee forfeiture. *See Burrow*, 997 S.W.2d at 240 (proof of actual damages not required for fee forfeiture in a breach of fiduciary duty case involving an attorney and his client); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (holding that actual damages were not required in a breach of fiduciary duty case in which an agent was required to forfeit a commission received from a conflicting interest even though the principal was unharmed); *First United Pentecostal Church v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) (reversing summary judgment on breach of fiduciary duty claim because fiduciary was correct that it did not need to provide evidence of damages when seeking equitable relief); *see also Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.*, 82 F. App'x 116, 121 (5th Cir. 2003) (applying *Burrow* to hold that "a client does not have to prove either causation or injury to be entitled to fee

forfeiture as a remedy for an attorney's breach of fiduciary duty"); *USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 280 (5th Cir. 2011) ("Under Texas law, a cause of action for breach of fiduciary duty may take one of two forms: if the suit seeks damages, then the plaintiff must prove duty, breach, actual injury, and causation; whereas if the suit seeks an equitable forfeiture of the fee paid to the fiduciary, then the plaintiff need only prove duty and breach to recover."). Critically, the Texas Supreme Court has stated that this rule on breach of fiduciary duty claims seeking fee forfeiture "applies generally in agency relationships." *Burrow*, 997 S.W.2d at 242–43.

In addition to actual and exemplary damages, Appellees explicitly sought fee forfeiture from Woodlark as the result of its alleged breaches of fiduciary duty. At trial, Appellees introduced evidence supporting the existence of a fiduciary relationship between Woodlark and the TICs. Appellees also introduced evidence supporting a finding that Woodlark breached its fiduciary duties to the TICs. For instance, Appellees introduced evidence that the CBRE Appraisal used by Woodlark was flawed and that Woodlark made unnecessary cash calls as the result of its failure to pursue tax refund litigation.

After five days of trial, the bankruptcy court found that (1) a fiduciary relationship existed between Woodlark and the Debtor TICs; and (2) Woodlark breached its fiduciary duties to the TICs by (i) making demands on the TICs to tender their ownership by claiming their interests were worth nothing based on a flawed appraisal, (ii) failing to keep up with the ad valorem tax litigation and tax protests, and (iii) issuing unnecessary cash calls. In other words, "Woodlark treated the [fiduciary] relationship as a typical contractual agreement in which both parties look out for their own financial interests first, and this was not such a contract." Based on these findings, the bankruptcy court specifically denied damages, but held that Woodlark would forfeit unpaid asset management fees, unpaid property management fees, and the 4.5%

transaction fee. Given the bankruptcy court's refusal to impose damages in favor of requiring Woodlark to forfeit various fees as the result of its breach of fiduciary duties to the Debtor TICs, the bankruptcy court did not err in failing to find causation and damages because no such finding was required to support fee forfeiture under Texas law. *See Burrow*, 997 S.W.2d at 239–40.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the bankruptcy court's decision to reduce UTSA's share of the net proceeds and AFFIRM its decision to reduce Woodlark's proof of claims. We REMAND for further proceedings consistent with this opinion.